**TUCSON MEDICAL CENTER, et al., Appellants,**

**v.**

**Louis W. SULLIVAN, M.D., Secretary, Department of Health and Human Services, Appellee.**

**No. 90–5360.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 23, 1991.

Decided Oct. 25, 1991.

Ronald N. Sutter, with whom, Barbara S. Woodall, Washington, D.C., was on the brief, for appellants.

Marcus H. Christ, Atty., Dept. of Health and Human Services, Washington, D.C., for appellee.

Stuart Gerson, Asst. Atty. Gen., Dept. of Justice, Jay B. Stephens, U.S. Atty., Dept. of Justice, and Lawrence M. Meister, Atty., Dept. of Health and Human Services, Washington, D.C., were on the brief, for appellee.

Henry R. Goldberg, Washington, D.C., also entered an appearance, for appellee.

Before WALD, D.H. GINSBURG and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

Under Medicare, a hospital that provides services to eligible patients is entitled to reimbursement under Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395–1395ccc (1988). This case is the latest in a series of disputes growing out of the decision of the Secretary of Health and Human Services (the "Secretary") to change the way hospitals are reimbursed for inpatient medical services. The appellants are four hospitals [1] that have challenged the Secretary's 1984 wage-index rule which, when applied retroactively, had the effect of decreasing the total amount of costs for which the hospitals were entitled to reimbursement. The underlying challenge to the wage-index rule was resolved on December 12, 1988, when the Supreme Court issued its decision in *Bowen v. Georgetown University Hospital*, 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988) (*"Georgetown I"*), holding the Secretary's retroactive wage-index rule invalid. Appellants do not dispute that their claims for reimbursement have been satisfied; their only claim in this appeal is that they are entitled un-

der the statute to interest on those amounts.

The hospitals appeal from the decision of the district court, *Tucson Medical Ctr. v. Sullivan*, 748 F.Supp. 28 (D.D.C.1990), dismissing as moot both their underlying claims and their claims for interest. Appellants argue that neither of their claims was moot at the time that their suit was filed, and the subsequent settlement of one of them—the underlying claim for reimbursement—did not thereby satisfy the other—the claim for interest. Furthermore, they argue that they have satisfied the statutory requirements for interest in that they properly sought judicial review, there was an amount in controversy, and they were the "prevailing party" within the meaning of 42 U.S.C. § 1395oo(f)(2). The Secretary disagrees, arguing that both claims were moot as a result of the decision in *Georgetown I* and that the Secretary had indicated to the hospitals, prior to the filing of the lawsuit, that they would be paid. Furthermore, he argues that even if the claims were not moot at the time the complaint was filed, appellants are not entitled to interest because there was no causal link between the filing of the suit and the decision of the Secretary to pay the claims. Because we find that appellants' claims were not moot at the time they were filed and that appellants were prevailing parties within the meaning of the statute and so entitled to interest on their reimbursement claims, we reverse.

## I. BACKGROUND

### A. *Reimbursement Under Medicare*

Medicare was created by the Social Security Amendments of 1965, Pub.L. No. 89–97, 79 Stat. 291. It is a nationwide health insurance program primarily for people who are aged sixty-five and over and available to covered beneficiaries without regard to their incomes or wealth. Until 1987, the Medicare program paid for hospital care based, at least in part, on a retro-

---

1. They are Tucson Medical Center (located in Tucson, Arizona), St. Cloud Hospital (located in St. Cloud, Minnesota), Community Hospital (located in Battle Creek, Michigan), and Tucson Hospital Liquidating Corporation (located in Tucson, Arizona, and formerly operating under the name of Tucson General Hospital).

spective, reasonable cost system. At the end of the fiscal year, a provider would file a report with its "fiscal intermediary," usually a private insurance company under contract with the government, indicating the total costs for which the provider seeks Medicare reimbursement. The fiscal intermediary would then audit the report and issue a Notice of Program Reimbursement ("NPR"), indicating the allowable costs for which the provider would be reimbursed by Medicare. If the provider disputed the NPR, it could appeal to the Provider Reimbursement Review Board ("PRRB") which would conduct a hearing. The Secretary could, on his own motion, reverse, affirm, or modify the PRRB's decision. After a final decision by either the PRRB or the Secretary, an unsatisfied provider could file a complaint in federal district court.[2] If the provider subsequently became a "prevailing party" in court, it was entitled to interest on the amount in controversy, calculated from 180 days after the issuance of the NPR. *See* 42 U.S.C. § 1395*oo* (1988).

Congress discovered that the problem with a system of reimbursement based on a retrospective calculation of reasonable costs was that it provided little incentive for hospitals to keep costs down. The more they spent, the more they were reimbursed. So Congress set about gradually to change the system of hospital reimbursement. In 1972, it amended the Social Security Act to authorize the Secretary to set prospective limits on the "direct or indirect overall costs or [on] costs incurred for specific items or services" delivered by Medicare providers. The new ceilings would be based on estimates of the "costs necessary in the efficient delivery of needed health services." Social Security Amendments of 1972, Pub.L. No. 92–603, § 223(b), 86 Stat. 1329, 1393.

The next major reform occurred in 1982, when Congress passed section 101 of the Tax Equity and Fiscal Responsibility Act ("TEFRA"), Pub.L. No. 97–248, § 101, 96 Stat. 324, 331 (1982) (codified as amended at 42 U.S.C. § 1395ww(b)). TEFRA amended the Social Security Act to slow down the increase in hospital costs and generally improve the fiscal condition of the Medicare program. Specifically, TEFRA established a new, separate, interim control on hospital cost increases. It required the Health Care Financing Administration ("HCFA") to provide incentives to hospitals that kept their costs below a "target amount" and to penalize those that exceeded their target amounts. A hospital's target amount was based on the allowable operating costs for inpatient hospital services during the "base year"—that is, the year *before* the first year subject to TEFRA, *see* 42 U.S.C. § 1395ww(b)(3)(A) (1988). In other words, in order to determine the costs for which a particular hospital would be reimbursed in a given year, it was necessary to know what the "allowable operating costs of inpatient hospital services" were for the "base year." The more costs that were deemed "allowable" in the base year, the more a hospital would be reimbursed in subsequent years for those same costs.

TEFRA was supposed to last for a maximum of three years.[3] Congress intended that it would be replaced by a system based entirely on prospective payments, and it directed the Secretary to develop "proposals for legislation which would provide that hospitals, skilled nursing facilities, and, to the extent feasible, other providers, would be reimbursed ... on a pro-

---

**2.** There is an exception to the final decision rule, known as the "expedited review" procedure, 42 C.F.R. § 405.1842 (1990), which permits a provider to petition the PRRB for a determination that it is without authority to pass on a question of law and to permit the provider to bypass PRRB review by seeking direct review of the fiscal intermediary's determination in federal court. 42 U.S.C. § 1395*oo*(f)(1) (1988). This was, in fact, the procedure used by appellants in this case.

**3.** The incentive payments and penalties "shall not apply to cost reporting periods of hospitals beginning on or after October 1, 1985." Pub.L. No. 97–248, § 101, 96 Stat. 324, 333 (1982) (codified at 42 U.S.C. § 1395ww(b)(2)), *repealed by* Social Security Act Amendments of 1983, Pub.L. No. 98–21, § 601(b)(4), 97 Stat. 65, 150.

spective basis." Pub.L. No. 97–248, § 101, 96 Stat. 324, 335 (codified at 42 U.S.C. § 1320b–5(c) (1988)). In fact, for most hospitals, TEFRA lasted for only one year; the Prospective Payment System ("PPS") became effective for reporting years beginning on or after October 1, 1983.[4] Under PPS, the Medicare program began to reimburse inpatient hospital care with a prospective payment per discharge based on diagnoses rather than on actual costs of treatment.[5]

## B. *Base Year*

The TEFRA year for each hospital was the first cost reporting period beginning on or after October 1, 1982. The base year was the 12–month period immediately preceding the TEFRA year.[6] Until the Medicare reimbursement system no longer depended on some proportion of the hospital-specific cost base—in other words, until October 1, 1987 when the PPS system had been fully phased in—the costs for which a hospital would be reimbursed depended, albeit to a diminishing degree, on the precise calculation of the "allowable costs" for the base year.[7] For the reporting periods between 1982 and 1987, HCFA's determination of what was and was not to be included in the hospital's cost base had a significant impact on the amount hospitals were reimbursed.

The fiscal intermediaries calculated the base year figures by auditing year-end cost reports already submitted by the hospitals.

The Secretary promulgated regulations which had the effect of excluding certain costs from the base year figure, and many of these regulations have been the subject of extensive litigation. The Secretary's regulation concerning the hospital wage index, however, may have been the most troublesome of all.

## 1. Wage Index

From 1974 to 1981, the Secretary published an annual cost-limit schedule for certain hospital services. The Secretary's schedule included a wage index that was used to calculate the cap on reimbursable wage costs. In 1981, the Secretary modified the wage-index formula; instead of calculating the wage index for a particular geographical area by using the average salary levels for *all* hospitals in the area, the 1981 wage index provided that wages paid by federal government hospitals would be excluded from the computation. Final Notice, 46 Fed.Reg. 33,637, 33,639 (1981) ("Because these hospitals typically use national pay scales, the amounts they pay their employees do not necessarily reflect area wage levels.").

Several hospitals in the Washington, D.C. area brought suit against the Secretary, seeking to have the 1981 schedule invalidated. The district court struck down the 1981 rule, *District of Columbia Hosp. Ass'n v. Heckler,* No. 82–2520 (D.D.C. Apr. 29, 1983), on the grounds that the Secre-

---

**4.** *See id.*

**5.** TEFRA continues to apply to hospitals that are not so-called "subsection (d) hospitals." These include hospitals not generally providing acute care, such as psychiatric, rehabilitation, pediatric, and long-term patient care. *See* H.R.Conf. Rep. No. 47, 98th Cong., 1st Sess. 193 (1983), *reprinted in* 1983 U.S.C.C.A.N. 143, 404, 483; 42 C.F.R. § 412.23 (1990).

**6.** Three of the appellant hospitals (Tucson Medical Center, St. Cloud Hospital, and Community Hospital) have a reporting period from July 1 to the June 30 of the following year, so their TEFRA year was between July 1, 1983 and June 30, 1984 and their base year was between July 1, 1982 and June 30, 1983. The fourth hospital (Tucson General Hospital, now known as Tucson General Liquidating Corporation) had a re-

porting year that corresponded with the calendar year, so its TEFRA year was January 1, 1983 to December 31, 1983, and its base year was January 1, 1982 to December 31, 1982.

**7.** Because a hospital's reimbursement under PPS would no longer be based on the actual costs to the hospital, Congress decided to provide for a "phase-in" period "to minimize disruptions that might otherwise occur because of a sudden change in reimbursement policy." H.R.Rep. No. 25, 98th Cong., 1st Sess., pt. 1, at 136 (1983), *reprinted in* 1983 U.S.C.C.A.N. 219, 355. PPS was phased in over a transition period, starting with the hospital's first accounting year beginning on or after October 1, 1983 and ending on or after October 1, 1987. During the transition period, a decreasing percentage of a hospital's reimbursement was based on the hospital's actual cost base.

tary had issued the new rule before providing notice and an opportunity for public comment in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 553 (1982). The Secretary decided not to appeal. Acting through the fiscal intermediaries, the Secretary reimbursed the hospitals according to the pre–1981 wage index.

In 1984, the Secretary "reissued" the 1981 wage-index rule, this time complying with the notice-and-comment requirements of the APA. *See* Final Notice, 49 Fed.Reg. 46,495, 46,499 (1984). But the Secretary gave the rule retroactive effect, covering cost accounting periods beginning on or after July 1, 1981. *Id.* In other words, the 1984 rule purported to cover *retroactively* what the 1981 rule would have covered *prospectively* had it not been struck down. Based on the 1984 wage index, the fiscal intermediaries recalculated the amount of the reimbursement and proceeded to recoup the overpayments from the hospitals.

Once again, the Washington, D.C. area hospitals filed suit, this time challenging the retroactive application of the 1984 wage-index rule. The district court struck down the provision, holding that the retroactive application of the rule was barred on equitable grounds. *Georgetown Univ. Hosp. v. Bowen*, No. 85–1845, 1986 WL 53398 (D.D.C. Apr. 11, 1986). This court affirmed the district court, but on different grounds, holding that both the APA and the Medicare statute prohibit retroactive rulemaking. *Georgetown Univ. Hosp. v. Bowen*, 821 F.2d 750 (D.C.Cir.1987). On December 12, 1988, the Supreme Court affirmed, concluding on the basis of the Medicare statute alone that the Secretary had no authority to promulgate retroactive cost-limit rules. *Georgetown I*, 488 U.S. at 215, 109 S.Ct. at 475 (1988).

### 2. Retroactive Recalculation

As the wage-index issue was being appealed through the federal courts, the Secretary took the position that even if the fiscal intermediaries had reimbursed hospitals during the PPS transition period based on calculations that were subsequently held to be improper, the Secretary was none-theless prohibited from making retroactive adjustments to reimbursements. The Secretary's argument, however, was rejected by this court:

> The phase-in created a hybrid of the old and the new. As a result, certain features of the old system continued to control the Medicare reimbursement process through the transition period. We conclude that the district court's judgment was correct insofar as it ordered the Secretary to recompute the target amount component of the prospective payment rates of appellees to conform with final judgments that these rates were initially calculated on the basis of invalid legal assumptions.

*Georgetown Univ. Hosp. v. Bowen*, 862 F.2d 323, 330 (D.C.Cir.1988) ("*Georgetown II*").

### C. Procedural History

The fiscal intermediaries settled appellants' cost reports for their TEFRA years by applying the Secretary's 1984 retroactive wage index in determining their base-year allowable costs. On November 14, 1988, appellants filed expedited judicial review petitions with the PRRB, arguing that because the PRRB is without authority to decide the question of whether the 1984 wage-index regulation is valid for the base years, appellants should be permitted to bypass the administrative review procedure and proceed directly to federal district court. *See* 42 U.S.C. § 1395oo(f)(1) (1988). The PRRB granted appellants' petitions on December 15, 1988, and pursuant to statute, appellants had sixty days from that date to file suit in federal court. They did so within six weeks, on January 25, 1989.

Three weeks *earlier*, on January 4, 1989, the Secretary had sent a copy of a memorandum to appellants' counsel in which the General Counsel's Office of the HCFA advised the PRRB that *Georgetown I* and *Georgetown II* control all "properly pending, and not otherwise settled, administrative and judicial appeals challenging the 1981 and 1984 Medicare wage[-]index rules." Transmittal Letter attached to copy of Memorandum from Henry R. Goldberg to Elise D. Smith ("January 4

Memorandum"). On January 26, 1989—the day *after* the suit was filed in district court—the HCFA issued a final ruling in which it conceded that the combination of *Georgetown I* and *Georgetown II* obliged HCFA to order the fiscal intermediaries to reimburse hospitals for amounts that were withheld because of the retroactive application of the 1984 wage-index rule:

> HCFA's nationwide acquiescence in the *Georgetown II* decision renders moot for lack of an actual case or controversy all pending (and not otherwise settled HSP [i.e., hospital-specific] rate) appeals that, first, satisfy the jurisdictional requirements imposed by 42 U.S.C. [§] 1395oo and that, second, request that the HSP rate be revised retroactively (or for the duration of the four-year transition period) to reflect additional base year costs that are (or will be) newly recognized as the result of: a final, nonappealable court judgment; the administrative actions identified in 42 C.F.R. [§] 412.-72(a)(3)(i) [permitting adjustment to base-period costs that are subsequently recognized as allowable]; [and] pending claims for reimbursement under the pre–1981 wage index component of the 1981 cost limits....

Health Care Financing Administration Ruling 89–1 (Jan. 26, 1989) ("HCFAR 89–1") at 10–11.

There is no dispute that the Secretary in fact has reimbursed appellants for the disputed TEFRA year amounts.[8] The only issue is whether or not appellants are entitled to interest on the amounts withheld. The Medicare statute provides for the payment of interest under limited circumstances:

> Where a provider seeks judicial review pursuant to [42 U.S.C. § 1395oo(f)(1)], the amount in controversy shall be subject to annual interest beginning on the first day of the first month beginning after the 180–day period [after the issuance of the fiscal intermediary's final

NPR] ... to be awarded by the reviewing court in favor of the prevailing party.

42 U.S.C. § 1395oo(f)(2) (1988).

The district court dismissed appellants' claims as moot, reasoning that *Georgetown I* "settled the underlying legal dispute concerning the retroactive adoption of the wage index ... [and] triggered the doctrines of stare decisis, collateral estoppel, and res judicata as to future claims against the Secretary on the same issue." *Tucson Medical Ctr. v. Sullivan*, 748 F.Supp. 28, 30 (D.D.C.1990). Because the court concluded that the parties lacked a legally cognizable interest in the outcome, it found that there was never a "case or controversy" and that it did not have subject-matter jurisdiction to hear appellants' claims for interest.

## II. DISCUSSION

The following questions are presented on appeal: First, did the district court err in concluding that the case was moot when filed or, alternatively, that the case became moot when the Secretary paid appellants' principal claims? Second, if there is jurisdiction, does 42 U.S.C. § 1395oo(f)(2) provide for the recovery of interest under the undisputed facts of this case?

### A. *Jurisdiction*

■ A federal court lacks jurisdiction to consider the merits of claims that are deemed "moot," because "the judicial power extends only to cases or controversies." *Powell v. McCormack*, 395 U.S. 486, 496 n. 7, 89 S.Ct. 1944, 1950 n. 7, 23 L.Ed.2d 491 (1969). A case is moot when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome. *Id.* at 496, 89 S.Ct. at 1950–51.

The district court dismissed appellants' claims as moot. The court concluded that "the parties lacked 'a legally cognizable interest in the outcome' of this action from the time it was filed." *Tucson*, 748 F.Supp. at 30 (quoting *Powell*, 395 U.S. at 496, 89 S.Ct. at 1950–51). In the alterna-

---

**8.** By March 8, 1989—six weeks after the complaint was filed—the Secretary had reimbursed all four hospitals the combined principal sum of over $750,000 in additional TEFRA year reimbursements.

tive, the district court suggested that any "potential dispute" became moot with "the Secretary's actual payment in full of the underlying claim...." *Id.* at 31. We shall consider both alternatives.

It is well-settled that "[w]here one of the several issues presented becomes moot, the remaining live issues supply the constitutional requirement of a case or controversy." *Powell,* 395 U.S. at 497, 89 S.Ct. at 1951; *Ramer v. Saxbe,* 522 F.2d 695, 704 (D.C.Cir.1975) ("A case is not moot so long as any single claim for relief remains viable, whether that claim was the primary or secondary relief originally sought."). So, for example, where a memorandum of understanding effectively settles the claims of the trustees of an employee benefit fund against an employer, it does not render moot any secondary claims that the trustees might have for liquidated damages or interest on delinquent contributions. *Ottley v. Sheepshead Nursing Home,* 784 F.2d 62, 66 (2d Cir.1986) ("[t]hese unsatisfied claims preserve the viability of the action and defeat the mootness argument"). Similarly, even though a union defendant has been decertified as the bargaining representative for plaintiffs—thereby rendering moot plaintiffs' principal claim for injunctive relief against the carrying out of the union's rebate scheme—plaintiffs' claims for money damages are not moot. *Ellis v. Brotherhood of Ry., Airline & S.S. Clerks,* 466 U.S. 435, 104 S.Ct. 1883, 80 L.Ed.2d 428 (1984).

> [D]amages for an illegal rebate program would necessarily have been in the form of interest on money illegally held for a period of time. That claim for damages remains in the case. The amount at issue is undeniably minute. But as long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot.

*Id.* at 442, 104 S.Ct. at 1889.

For these reasons, appellants' interest claims are moot only if the underlying reimbursement claims were moot at the time they were filed. If appellants presented a "case or controversy" as to the reimburse-

ment on January 25, 1989, their claims for interest would not subsequently have become moot simply because the Secretary paid the underlying claims. It is undisputed that the payments in February and March of 1989 did not include interest.[9]

■ The Secretary argues that appellants' claims were indeed moot at the time the complaint was filed. In support of this argument, the Secretary insists that *Georgetown I* definitively resolved the underlying dispute concerning the retroactive application of the wage index. If there were any doubts, the Secretary asserts that his January 4 Memorandum satisfied them. The Secretary argues that the intention of the HCFA was clearly to settle all pending claims challenging the retroactive application of the 1984 wage index. And yet, three weeks *after* the January 4 Memorandum, appellants filed suit.

The Secretary's argument is ultimately unconvincing. The Secretary was very careful to limit the extension of *Georgetown I* and *Georgetown II* "to all properly pending, and not otherwise settled, administrative and judicial appeals challenging the 1981 and retroactive 1984 Medicare wage index rules," January 4 Memorandum at 1. The PRRB had granted appellants' petition for expedited judicial review on December 15, 1988, thereby exhausting appellants' administrative remedies. Had appellants chosen not to file suit within the sixty-day statutory period—in other words, had they interpreted the January 4 Memorandum as definitively settling their claims—it is quite possible that they would no longer have had "properly pending" administrative or judicial appeals. Both the January 4 Memorandum and HCFAR 89-1 explicitly conditioned the Secretary's acquiescence to those claims that "satisfy the jurisdictional requirements imposed by 42 U.S.C. [§] 1395oo." January 4 Memorandum at 3; HCFAR 89-1 at 10.

Furthermore, there is no dispute that appellants properly petitioned for expedited judicial review, that the PRRB granted their petitions, and that they filed suit with-

---

9.  *See id.*

in the requisite time period. The constitutional "case or controversy" requirement and the statutory jurisdictional requirement boil down to the same question: Was there an "amount in controversy" at the time the suit was filed? Over eighty-years ago, the Supreme Court stated in the context of diversity jurisdiction that

> [i]t is not necessary that the defendant should controvert or dispute the claim. It is sufficient that he does not satisfy it. It might be that he could not truthfully dispute it, and yet, if from inability, or, mayhap, from indisposition, he fails to satisfy it, it cannot be that because the claim is not controverted the Federal court has no jurisdiction of an action brought to enforce it. Jurisdiction does not depend upon the fact that the defendant denies the existence of the claim made, or its amount or validity. If it were otherwise, then the circuit court would have no jurisdiction if the defendant simply admitted his liability and the amount thereof as claimed, although not paying or satisfying the debt.

*In re Reisenberg*, 208 U.S. 90, 108, 28 S.Ct. 219, 223–24, 52 L.Ed. 403 (1908). The Secretary had been refusing to pay appellants for over three years; his cryptic concession of error in the January 4 Memorandum was insufficient for appellants reasonably to conclude that their claims would be satisfied absent the filing of their suit in federal court. Appellants' counsel only did what any good lawyer in his position should have done.

On January 25, 1989, appellants' claims for reimbursement were not moot. When the Secretary finally settled the principal reimbursement claims, appellants' claims for interest remained. The question now is whether, under the facts of this case, appellants are entitled to interest.

**B.** *Merits*

■ There is no dispute that the doctrine of sovereign immunity limits the appellants' rights to interest on claims for Medicare reimbursement to that which is expressly authorized by statute. *Library of Congress v. Shaw*, 478 U.S. 310, 311, 106 S.Ct. 2957, 2959–60, 92 L.Ed.2d 250 (1986) ("The no-interest rule is to the effect that interest cannot be recovered in a suit against the Government in the absence of an express waiver of sovereign immunity from an award of interest."). Such a waiver must be strictly construed in favor of the government. *McMahon v. United States*, 342 U.S. 25, 26, 72 S.Ct. 17, 18, 96 L.Ed. 26 (1951); *Georgetown Univ. Hosp. v. Sullivan*, 934 F.2d 1280, 1287 (D.C.Cir. 1991).

Under the applicable statute,

> [w]here a provider seeks judicial review pursuant to [42 U.S.C. § 1395*oo*(f)(1)], the amount in controversy shall be subject to annual interest beginning on the first day of the first month beginning after the 180–day period [after the issuance of the fiscal intermediary's final NPR] ... to be awarded by the reviewing court in favor of the prevailing party.

42 U.S.C. § 1395*oo*(f)(2) (1988). There are three issues to resolve: First, whether appellants sought judicial review pursuant to 42 U.S.C. § 1395*oo*(f)(1); second, whether there was an "amount in controversy"; and third, whether appellants were the "prevailing part[ies]."

**1. Judicial Review**

■ In this case, appellants have clearly exhausted their administrative remedies under 42 U.S.C. § 1395*oo*(f)(1). In November 1988, they filed petitions to obtain judicial review of the fiscal intermediaries' reimbursement determination with respect to the TEFRA year. The PRRB granted their petitions for expedited review. Within sixty days, they filed suit in district court. It is thus clear that appellants properly sought judicial review of the fiscal intermediaries' determination.[10]

---

**10.** The Secretary's reliance on *Riley Hospital & Benevolent Ass'n v. Bowen*, 804 F.2d 302 (5th Cir.1986), is misplaced. In *Riley*, the providers sued for interest on amounts wrongfully withheld for fiscal years that were never the subject of judicial review. The Fifth Circuit concluded that "[b]ecause there had been no final decision by the Board [for fiscal years 1975 through 1979], the cost payments for these years were not within the jurisdiction of the district court

## 2. Amount in Controversy

■ In granting their petitions for expedited review, the PRRB expressly found that there was an "amount in controversy."[11] Indeed, the PRRB does not have jurisdiction to hear an appeal from the fiscal intermediary's determination unless "the amount in controversy is $10,000 or more," 42 U.S.C. § 1395oo(a)(2) (1988), and the PRRB has authority to grant expedited review only after it first determines that the provider is entitled to a hearing under § 1395oo(a), see 42 C.F.R. § 405.1842(b)(2) (1990). In other words, simply by granting the petitions for expedited review, the PRRB necessarily found that there existed an amount in controversy in excess of $10,000.

The PRRB determinations were made three days *after* the decision in *Georgetown I,* suggesting that the PRRB itself had not concluded that the Supreme Court's decision had eliminated any controversy. It seems inconsistent, to say the least, for the Secretary now to suggest that appellants should have concluded that no amount in controversy remained after *Georgetown I* when his own PRRB had estimated amounts in controversy ranging from $63,000 to over $380,000.

■ It is well-settled that the "amount in controversy" must be determined as of the date the suit was filed. *Hospital Ass'n of Rhode Island v. Secretary of Health & Human Servs.,* 820 F.2d 533, 537 n. 9 (1st Cir.1987). We have already concluded that when appellants filed suit on January 25, 1989, there existed an amount in controversy such that their claims were not moot. The Secretary's admission in his January 4 Memorandum that he would satisfy "all properly pending appeals" did not eliminate the amount in controversy for jurisdictional purposes.

## 3. Prevailing Party

■ The district court granted the Secretary's motion to dismiss on the grounds that it did not have jurisdiction over appellants' claims for interest, so the court never resolved the question of whether, under the facts of this case, appellants were "prevailing part[ies]" within the meaning of § 1395oo(f)(2). Even though a district court does not address a particular question, an appellate court need not remand for findings on that question if the appellate court's decision is based on undisputed historical facts contained in the record. *Adams v. Agnew,* 860 F.2d 1093, 1097 (D.C.Cir.1988); *King v. Commissioner,* 458 F.2d 245, 249 (6th Cir.1972) ("a remand is unnecessary if all the evidence is documentary and the appellate court can pass upon the facts as well as the trial court, or if all the facts relied upon to support the judgment are in the record and are undisputed, or if the record as a whole presents no genuine issue as to any material fact"). The facts concerning whether or not appellants were "prevailing part[ies]" are not in dispute; the only question is whether the undisputed facts support the conclusion that appellants prevailed and are therefore entitled to interest within the meaning of § 1395oo(f)(2).

The Secretary argues that in the absence of a statutory definition of "prevailing party," we ought to defer to the agency's interpretation of that term. *Connecticut Dep't of Income Maintenance v. Heckler,* 471 U.S. 524, 530–32, 105 S.Ct. 2210, 2213–

---

when it made its order." *Id.* at 305. The *Riley* court properly denied the recovery of interest because the providers had not exhausted their administrative remedies for the fiscal years in question.

The Secretary's reliance on *National Medical Enterprises, Inc. v. Sullivan,* [1991 Transfer Binder] Medicare & Medicaid Guide (CCH) ¶ 38,818, at 23,910 (C.D.Cal. July 5, 1990) is similarly inappropriate. In *National Medical,* the issue was whether the provider could recover interest on its return-on-equity capital claims for fiscal years 1980–84 when it had previously

prevailed on its claims for fiscal years 1974–79. The district court properly reasoned that it did not have jurisdiction over the 1980–84 claims because the PRRB had never rendered a final decision as to these years. Once again, the issue was failure to exhaust administrative remedies. And once again, that is not this case.

**11.** The PRRB estimated that the amount in controversy was approximately $383,000 for Tucson Medical Center, $137,000 for St. Cloud Hospital, $200,000 for Community Hospital, and $63,000 for Tucson General Hospital.

14, 85 L.Ed.2d 577 (1985); *Blum v. Bacon,* 457 U.S. 132, 141, 102 S.Ct. 2355, 2361, 72 L.Ed.2d 728 (1982); *see also Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). The Secretary contends that the agency's regulation implementing § 1395*oo*(f)(2) definitively requires that there be a judgment prior to the award of any interest:

> If a provider of services seeks judicial review by a Federal court ... of a decision furnished by the Provider Reimbursement Review Board or subsequent reversal, affirmation, or modification by the Secretary, the amount of any award of such Federal court will be increased by interest payable by the party against whom *the judgment* is made....

42 C.F.R. § 413.64(j)(1) (1990) (emphasis added).

■ But the Secretary's regulation is irrelevant. Section 1385*oo*(f)(2) is expressly directed to the judiciary. It provides that interest shall "be awarded *by the reviewing court* in favor of the prevailing party,*" 42 U.S.C. § 1395*oo*(f)(2) (1988) (emphasis added). The deference normally accorded to the administrative agency's interpretation of its own statute is simply inapplicable when the statutory provision is not one directed to the agency's administration of the law. "A precondition to deference under *Chevron* is a congressional delegation of administrative authority." *Adams Fruit Co. v. Barrett,* 494 U.S. 638, 110 S.Ct. 1384, 1390, 108 L.Ed.2d 585 (1990);

*see also Crandon v. United States,* 494 U.S. 152, 177, 110 S.Ct. 997, 1011, 108 L.Ed.2d 132 (1990) (Scalia, J., concurring) (law that "is not administered by any agency but by the courts" is not entitled to deference under *Chevron* ).[12]

■ To our knowledge, no court has had occasion to interpret the meaning of "prevailing party" in § 1395*oo*(f)(2). However, the legislative history of the provision is suggestive. Prior to 1974, providers had a right to judicial review only where the Secretary reversed or adversely modified a favorable decision of the PRRB. The new provision gave

> to providers of services the right to judicial review of any Provider Reimbursement Review Board decision, as well as of any subsequent affirmations, modifications or reversals by the Secretary. In addition, when a provider seeks judicial review, the amount in controversy shall be subject to annual interest beginning 6 months after the intermediary has made a final determination....

S.REP. No. 1065, 93d Cong., 2d Sess. 4 (1974), *reprinted in* 1974 U.S.C.C.A.N. 5992, 5995. The Conference Report indicated that "[t]he amendment would permit judicial review of the Board's unmodified findings as well. In addition, interest would be paid to the party who won—the government or provider." H.R.CONF.REP. No. 1407, 93d Cong., 2d Sess. 3 (1974), *reprinted in* 1974 U.S.C.C.A.N. 5995, 5996.[13]

---

**12.** In any case, it is hardly surprising that the Secretary's regulation only contemplates interest after a judgment. A provider seeks judicial review after having received an adverse decision by the Secretary or his agents. Only in the rarest of cases, like this one, would the Secretary voluntarily reverse his decision in favor of the provider without first having received a judgment. The preambles to both the proposed rule, 40 Fed.Reg. 26,540–41 (1975), and the final rule, 41 Fed.Reg. 52,050–51 (1976), neither provide for the award of interest in the absence of a judgment nor suggest that such an award would be inappropriate.

**13.** Senator Long, who was the Chairman of the Finance Committee and the principal supporter of the bill containing the Medicare amendments, reiterated on the Senate floor that "any

amount in controversy would be subject to annual interest, payable to the party who won," 120 CONG.REC. 35,675 (1974); Representative Ullman also introduced the conference report to the House by stating that, under the proposed amendment, "interest would be paid to the party who won—the Government or the provider." *Id.* at 35,464.

It would thus appear from the legislative history as well as from the plain meaning of the words "prevailing party" that Congress' main intent was to compensate the party entitled to the amount in controversy for the time value of money wrongfully withheld. Statutory interest provisions are generally construed to have that purpose. "Interest compensates for [delay in payment] and for the loss in purchasing power caused by inflation, which is a component of

Courts have interpreted the words "prevailing party" in statutory provisions for the award of attorneys' fees as requiring a nexus between the filing of the lawsuit and the substantial achievement of the petitioners' goals. These provisions discussed below are generally designed to encourage worthy civil rights actions or to discourage recalcitrant agency behavior. In the case of this statute, however, where the primary goal is to compensate the party who eventually receives the money for the delay occasioned by the other party's error, the nexus is explicit in the statute itself: Interest will be awarded only after a suit is properly filed, which in turn means that the Secretary's agency has made a determination adverse to the provider. From this perspective, a party in court prevails as soon as it receives the disputed amount.

But even analyzing the term "prevailing party" in § 1395oo(f)(2) as it has been understood in other statutory contexts—principally the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988 (1988), and the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412(d) (1988), both of which were enacted subsequent to § 1395oo(f)(2)—we would conclude that appellants have indeed "prevailed" in their cause of action. In *Commissioners Court of Medina County, Texas v. United States*, 683 F.2d 435 (D.C.Cir.1982), we adopted a two-prong test to determine whether a party is "prevailing": "[F]irst, the party must have substantially received the relief sought, and, second, the lawsuit must have been a catalytic, necessary, or substantial factor in attaining the relief." *Id.* at 440.[14]

Applying this two-part test to the undisputed facts of this case, there is no question that appellants have received the relief they sought when filing this suit, albeit through settlement rather than through judgment of the court.[15] We believe the lawsuit was "necessary" in light of the Secretary's decision to limit payment to "all pending (and not otherwise settled HSP rate) appeals that . . . satisfy the jurisdictional requirements imposed by 42 U.S.C. [§] 1395oo." HCFAR 89–1 at 10. Had appellants not filed suit within the sixty-day period, the Secretary might well have claimed that they failed to satisfy the requirements of § 1395oo(f)(1) and that, therefore, the concession in HCFAR 89–1 did not apply to them.[16]

interest." *Oklahoma Aerotronics, Inc. v. United States*, 943 F.2d 1344, 1348 (D.C.Cir.1991).

14. In *Medina County*, we were concerned with interpreting the meaning of "prevailing party" in the attorneys' fee provision of the Voting Rights Act of 1965, 42 U.S.C. §§ 1971–1974e (1988), which provides that "[i]n any action or proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendment, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs," *Id.* § 1973*l*(e) (1988).

15. The Supreme Court has stated unequivocally that an actual judgment is unnecessary in order for a party to be considered prevailing:

It is settled law, of course, that relief need not be judicially decreed in order to justify a fee award under § 1988. A lawsuit sometimes produces a voluntary action by the defendant that affords the plaintiff all or some of the relief he sought through a judgment. . . . If the defendant, under the pressure of the lawsuit, pays over a money claim before the judicial judgment is pronounced, the plaintiff has "prevailed" in his suit, because he has obtained the substance of what he sought.

*Hewitt v. Helms*, 482 U.S. 755, 760–61, 107 S.Ct. 2672, 2675–76, 96 L.Ed.2d 654 (1987).

16. In *Guglietti v. Secretary of Health & Human Services*, 900 F.2d 397 (1st Cir.1990), the court confronted a similar argument with respect to a claim for attorneys' fees under the EAJA. While plaintiff's appeal from the Secretary's adverse determination on a benefits claim was pending, Congress enacted the Social Security Disability Benefits Reform Act of 1984, Pub.L. No. 98–460, 98 Stat. 1794, which mandated that all cases undergoing judicial review be returned to the Secretary for reconsideration in accordance with newly promulgated standards. Plaintiff claimed that she was entitled to attorneys' fees as a prevailing party because had she not brought her original complaint, she would not have been in a position to benefit from Congress' action. The majority disagreed, cautioning against confusing "a *condition* of recovery with a *cause* of recovery." *Id.* at 400 (emphasis in original). *Guglietti* involved a remand for reconsideration brought about by a congressional directive; in our case, the Secretary's motivation for paying out the total amount in controversy was intimately tied to a litigation strategy in which the appellants' instant lawsuit was a part. At any rate, we find Judge Breyer's dissent to contain the more persuasive reasoning on the point:

[T]he following circumstances make it proper, as a matter of ordinary English usage, as well

We note as well that their suit certainly served as a "catalyst" for the settlement of their claims, because several providers who had participated in *Georgetown I* but who chose not to seek expedited review are still waiting for the additional reimbursement for their TEFRA years. Indeed, as the Secretary's counsel admitted at oral argument, appellants were placed at the top of the payee list by virtue of their having filed suit, probably because he realized that appellants would be continually accruing interest until they were finally paid the amounts due them. *See, e.g., Chicano Police Officer's Ass'n v. Stover*, 624 F.2d 127, 131 (10th Cir.1980) (" '[T]he "compliance" achieved in this case would not have happened, *certainly not as early or as thoroughly as it has*, without the initial and continued impact of plaintiffs' action.' " (emphasis added) (quoting *Aspira of New York, Inc. v. Board of Educ.*, 65 F.R.D. 541, 544 (S.D.N.Y.1975))); *Public Citizen Health Research Group v. Young*, 909 F.2d 546, 550 (D.C.Cir.1990) (holding that plaintiff was "prevailing party," at least in part because lawsuit forced agency to promulgate desired regulation more quickly than agency otherwise would have).[17] In sum, we believe that appellants have fully met the traditional test for prevailing parties generally applied to fee-shifting statutes.

## III. CONCLUSION

For the reasons discussed, we hold that appellants presented a case or controversy

as a matter of law, to say that the claimant "prevailed" in her legal action. First, she did get the relief she wanted. Second, her legal action was a necessary condition for her obtaining it. That is to say, had she not filed her action when she did, the Social Security Administration's termination would have become final; and Congress's statute would not have resurrected her case. Third, the outside event—the Congressional action—that brought her relief was not an unrelated, extra-judicial event. Rather, Congress acted, in part, because this claimant, and other claimants similarly situated, had filed lawsuits. *Id.* at 405 (Breyer, J., dissenting) (citations omitted).

17. The Secretary voluntarily paid interest in *Ardmore Adventist Hospital v. Sullivan*, [1989–2

when they filed their suit in this case and, as a result of the Secretary's concession and payment of the amount in controversy, they are the prevailing parties within the meaning of the Medicare statute. We therefore reverse the decision of the district court and remand for the limited purpose of calculating the amount of interest due.

*It is so ordered.*

Transfer Binder] Medicare & Medicaid Guide (CCH) ¶ 38,061, at 21,067 (D.D.C. Sept. 25, 1989), a case involving reimbursement for malpractice insurance costs which also settled as a result of the Secretary's concession in HCFAR 89–1. The Secretary has attempted to distinguish *Ardmore* on the grounds that the hospitals in *Ardmore* were already before the district court at the time *Georgetown I* was decided. But this argument goes only to the question of jurisdiction, an issue that we have already resolved. In *Ardmore,* the Secretary appears to have conceded that the hospitals were prevailing parties. But the fact that *Ardmore* was pending in court at the time of *Georgetown I* is irrelevant to the question of whether it satisfied the prevailing party requirement however defined.