**RYE PSYCHIATRIC HOSPITAL CENTER, INC., Plaintiff,**

v.

Donna E. SHALALA, Secretary, United States Department of Health and Human Services, Defendant.

No. 92 Civ. 4758(CLB).

United States District Court, S.D. New York.

March 22, 1994.

**1172**

Frederick Nicoll by Frederick Nicoll and Jack Schoenholtz, New York City, for plaintiff.

U.S. Attorney's Office by Paula Dow, Asst. U.S. Atty., New York City, for defendant.

## MEMORANDUM DECISION

BRIEANT, District Judge.

This case is brought by plaintiff Rye Psychiatric Hospital Center, Inc.[1] (the "Hospital"), a provider of in-patient hospital services to Medicare-eligible patients under an agreement filed with the defendant Secretary of the United States Department of Health and Human Services (the "Secretary") pursuant to 42 U.S.C. § 1395cc. The action arises under Title XVIII of the Social Security Act ("Medicare"), 42 U.S.C. §§ 1395 *et seq.;*[2] Chapter 7 of the Administrative Procedure Act, 5 U.S.C. § 701 *et seq,* and the Fifth Amendment to the United States Constitution. This court has jurisdiction of the action under 28 U.S.C. § 1331, 28 U.S.C. § 1361, and 42 U.S.C. § 1395oo(f)(1).

The parties cross-move for summary judgment. Based on the papers submitted and oral argument held on February 4, 1994, the motions by the parties are resolved pursuant to 28 U.S.C. §§ 2201–2202 by the declaration as set forth below, and in all other respects are denied.

Hospitals providing in-patient services to Medicare-eligible patients are entitled to have their reimbursements reviewed to ensure that such payments for necessary services are fair and reasonable.

This case involves a challenge by a private psychiatric hospital seeking to overturn several Medicare reimbursement provisions and regulations promulgated thereunder by the Secretary. The plaintiff hospital is one of a minority of hospitals "exempt"[3] from the system based on diagnostic-related prospective payment rates now applicable to most in-patient hospital services for Medicare-eligible individuals.

The Court holds that under the statute the hospitals may obtain adjustments of any unworkable restrictions under the statutory framework and obtain judicial review if such adjustments are arbitrarily denied. The Court further finds that hospitals confronting an unusually large proportion of governmentally-subsidized patients who do not produce as much income to the hospital as others, are entitled to have this hardship considered under statutory provisions applicable to each type of hospital.

The plaintiff Hospital is entitled to a judgment declaring its rights under the statute and regulations.

## THE STATUTORY AND REGULATORY FRAMEWORK

Before addressing the merits of the controversy before me, it is important to clarify various terms and reimbursement methods used in this complicated statute, *see New York City Health and Hospitals Corp. v. Perales,* 954 F.2d 854, 858 (2d Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 461, 121 L.Ed.2d 369 (1992) with its many interlocking and arguably obliquely interrelating provisions. All statutory references are to the Medicare provision governing payments to hospitals for in-patient services, 42 U.S.C. § 1395ww (1993), unless otherwise specified.

*Pre–1983: "reasonable actual costs"*

Until October 1983, the Medicare program

---

1. Although brought originally as a representative action under Fed.R.Civ.P. 23(b)(2) on behalf of so-called "exempt" hospitals (see page 11 below), this suit is going forward as an individual action. *See* Plaintiff's Memorandum of Law in Support of Motion for Summary Judgment ("Pl. Mem.") at 1.

2. The papers in support of the Hospital's cross-motion refer to the Medicaid statute, Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 *et seq.,* but its complaint does not.

3. See page 11 below for a description of this category of hospitals under the Medicare Act.

reimbursed hospitals for in-patient services [4] under a retrospective, cost-based system which was called a "reasonable cost" regime.[5] See 42 U.S.C. § 1395 ("§ 1395") 1395f(b); § 1395x(v); *see generally Episcopal Hospital v. Shalala*, 994 F.2d 879, 881–882 (D.C.Cir. 1993), *cert. denied* —— U.S. ——, 114 S.Ct. 876, 127 L.Ed.2d 73 (1994); *Tucson Medical Center v. Sullivan*, 947 F.2d 971, 973–975 (D.C.Cir.1991). "Reasonable cost" of covered services was defined as "the *cost actually incurred*, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services." § 1395x(v) (emphasis added). Hospitals received reimbursement for allowable operating costs of services provided to patients on a *per diem* basis on days for which the patients had Medicare coverage. *See* § 1395q(d), 1395x(v).

These provisions, and particularly § 1395f(b), are referred to hereinafter as the "reasonable actual cost provisions."

*Adjusted cost based on prior years (TEFRA limitations): § 1395ww(b)* [6]:

"Concerned that this system provided little incentive for hospitals to reduce or contain costs because reasonable cost reimbursement shifts the burden of cost increases from hospitals to the federal government," *Episcopal Hospital*, 994 F.2d at 881; *Tucson Medical Center*, 947 F.2d at 974, Congress imposed in 1982 a limit to slow the rate of increases of in-patient reimbursement but the basic retrospective cost-based framework of the pre-October 1983 system was left intact. These limitations were enacted as part of the Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA"), Pub.L. No. 97–248, 96 Stat. 324 (1982). The applicable provisions, codified as amended at 42 U.S.C. § 1395ww(b), "intended to restrain growth of hospital costs and to relieve the stress that increases in these costs put on the financial soundness of the Hospital Insurance Trust Fund." 47 Fed. Reg. 43282 (September 30, 1982).[7]

Under TEFRA as set forth in § 1395ww(b), a new, separate, interim control [8] was put in effect, whereby hospitals which keep their costs below a certain "target amount" are provided with incentives in the form of bonuses, while hospitals exceeding their target amounts are penalized by reductions in the amount of their reimbursements. Subsection (b)(1).

The Secretary has determined in the regulation promulgated under section (b) [9] that for each 12–month cost reporting period (a "cost reporting period"), a hospital's target amount is computed first by determining the "allowable operating costs" for inpatient hospital services "incurred in the 12–month cost reporting period *immediately preceding* the first cost reporting period subject to ceilings established under this section." 42 C.F.R. § 413.40(b)(1) (emphasis added). This pre-

4. Medicare Part A, 42 U.S.C. § 1395c *et seq.*, providing coverage for in-patient hospital services.

5. Payment was based mainly on the lesser of "reasonable cost" or the "customary charges" that a hospital incurred. § 1395f(b)(1).

6. Section 1395ww, added to Title XVIII in 1982, is entitled "Payments to hospitals for inpatient hospital services." Three sections of § 1395ww are relevant to the issues presented here. For convenience, they will be referred to as "section (a)," "section (b)," and "section (d)"; specific parts of those sections will be referred to as subsections and will include as the first letter the section to which they apply (e.g., subsection (a)(4)).

As described more fully below, sections (a) and (b) both imposed limitations on operating costs but continued the use of a retrospective basis for the initial starting point in calculating the actual payment to be made to hospitals. Section (d), not applicable to the Hospital here, uses a different methodology, one based on prospectively-based predetermined fees for treating each medical condition.

The reimbursement formula set forth in section (a) was short-lived; it imposed a more constraining method of calculation than under the reasonable actual cost provision, § 1395f(b), but was less restrictive than the TEFRA computation under section (b) of § 1395ww. All parts of § 1395ww(a) except subsection (a)(4) appear to have expired by the section's own terms, *see* subsection (a)(1)(D), prior to 1985, the first year complained of by the Hospital, which has provided no basis for finding otherwise.

7. Hereinafter, TEFRA refers to the relevant part of that statute, 42 U.S.C. § 1395ww(b).

8. *See Tucson Medical Center v. Sullivan*, 947 F.2d 971, 974 (D.C.Cir.1991).

9. 42 C.F.R. § 413.40.

ceding 12–month period is called in the regulation the "base year;" [10] *id.* at § 413.40(b)(1), despite the absence of that term from the statutory subsection (b)(3)(A).[11] Step two in the computation process adds to that base year figure an annual statutory percentage increase.[12] These two components yield the target amount for the first year to which TEFRA applied.

In years after the first year TEFRA was in effect for the particular hospital, the previous year's target amount (base plus increase) becomes the foundation upon which the annual statutory increase is added to become the next target amount, and so forth. *See* subsection (b)(3)(A)(ii) [13]; ·42 C.F.R. § 413.-40(c)(4). The target amount for each cost-reporting period is adjustable under subsection (b)(4), explicated in greater detail in 42 C.F.R. § 413.40(g)–(h), as further described below.

The ability of a hospital to meet the target amount for each cost-reporting period is the basis for determining whether incentive payments or penalties will apply for the particular period.[14]

The Secretary describes the target amount as the "[c]eiling on rate of hospital cost increases," 42 C.F.R. § 413.40 (title), and uses "target amount" and "ceiling" interchangeably, *id.* at § 413.40(c)(4), although "ceiling" does not appear in the statute.

**10.** Subsections (b)(3)(C), (D), (E), which were subsequently added to subsection (b)(3) for the computation of target amounts but are not applicable to the Hospital here, use·the term "base cost reporting period." *See* footnote 33 below.

**11.** The statute at subsection (b)(3)(A)(i) provides that the target amount for the "first such reporting period for which this subsection is in effect," would begin with the "allowable operating costs ... recognized under this subchapter for such hospital for the *preceding* 12–month cost reporting period."

**12.** Termed in the statute an "applicable percentage increase." *See* subsection (b)(3)(A).

**13.** Subsection (b)(3)(A)(ii) reads: "in the case of a later reporting period, the target amount for the preceding 12–month cost reporting period," and is followed by a clause applicable to both the first and subsequent years which states: "increased by the applicable percentage increase ... for that particular cost reporting period."

In sum, the Secretary interprets the statute to provide that each year's target amount computation relies on the target amount of the prior year, ultimately leading back to the base year. In essence, the "base year" is fixed,[15] and consequently imposes cost restraints·far greater than the pre–1983 system. While the original base year calculation begins with retrospective actual costs determined to be reasonable, further limits are placed on those costs ·by the small annual increases permitted under the statute. For the Hospital here, the base year was and at present appears to remain 1982,[16] regardless of ·costs actually incurred in later years.

*Exceptions and adjustment under TEFRA*

Specific exceptions and adjustments to the limits imposed under TEFRA are contained in § 1395ww(b)(4)(A) (the "adjustment provision"), which provides that:

> The Secretary *shall* provide for an exemption from, or an exception and adjustment to, the [adjusted cost based on prior years] method ... where *events beyond the hospital's control or extraordinary circumstances, including changes in the case mix of such hospital,* ... create a distortion in the increase in costs for a cost reporting period (including any distortion in the costs for the base period against which such increase is measured).

Subsection (b)(3)(A) is set forth in relevant part on page 19 below.

**14.** Under subsection (b)(1)(A) the incentive payment for those hospitals whose operating costs within a cost-reporting (12–month) period ·"are less than or equal to the target amount" is the operating cost amount plus "(i) 50 percent of the amount by which the target amount exceeds the amount of the operating costs, or (ii) 5 percent of the target amount, whichever is less." The penalty under (b)(1)(B) is, with some exceptions not relevant to the analysis here, the amount greater than the target amount.

**15.** The statute was amended in 1990 to permit the Secretary to assign a new base period "which is more representative of the reasonable and necessary costs to a hospital providing inpatient services," § 1395ww(b)(3)(B).

**16.** The Hospital does not appear to have sought a new base period pursuant to the amendment cited in footnote 15 above.

(emphasis added). In 1990, Congress added sentence 2, which reads in relevant part:

> The Secretary may provide for such other exemptions from, and exceptions and adjustments to, such method as the Secretary *deems appropriate, including* the assignment of a new base period which is more representative, as determined by the Secretary, of the reasonable and necessary cost ...

(emphasis added).

*Prospective diagnostic-based payments (the "prospective payment system") for section (d) hospitals: § 1395d*

The "adjusted cost based on prior years" system under TEFRA was originally expected to last approximately three years.[17] In actuality, TEFRA only lasted for one year for most hospitals, see *Tucson Medical Center v. Sullivan,* 947 F.2d 971, 975 (D.C.Cir. 1991), although it continues to apply to certain types of hospitals and facilities, including the Hospital here. Because the Hospital challenges its reimbursement in comparison with that available to hospitals falling within what has come to be known as the "prospective payment system" (from which the Hospital is excluded), it is necessary to give a brief description of that prospectively-based method, which applies now to the vast majority of American hospitals.

In 1983, Congress replaced the system mandated by TEFRA with a more radical reform of inpatient cost reimbursement, *Episcopal Hospital v. Shalala,* 994 F.2d 879, 881 (D.C.Cir.1993), *cert. denied,* ⸺ U.S. ⸺, 114 S.Ct. 876, 127 L.Ed.2d 73 (1994); *see* 42 U.S.C. § 1395ww(d). The new prospectively-based system " 'completely changed the method of reimbursing a hospital's Medicare costs,' " *Doctors Hosp., Inc. of Plantation v. Bowen,* 811 F.2d 1448, 1449 (11th Cir.1987) (citation omitted). Congress believed that the new system would relieve two major problems caused by Medicare's prior reasonable-cost based system: inefficiency on the part of hospitals and lack of federal control over expenditures for hospital care. H.R.Rep. No. 25, 98th Cong., 1st Sess. 132, *reprinted in* 1983 U.S.Code Cong. & Admin.News 143, 219, 351.

This system bases reimbursement primarily[18] on predetermined, prospective national and regional rates on a per diagnosis (per-case) basis instead of the previous per-diem cost. *See Episcopal Hospital,* 994 F.2d at 881. Medicare patients are classified and reimbursement to hospitals is provided on the basis of some 470 classifications (known as "diagnostic related groups" or "DRGs") rather than on the actual costs of individual cases. *Id.;* § 1395ww(d).

These hospitals are referred to hereinafter as "section (d)" hospitals or hospitals "paid under the prospective payment system."

*Hospitals excluded from the prospective payment system ("exempt hospitals")*

Section 1395ww(d) excludes from the cost-containment system based on prospective rates four types of hospitals: private psychiatric hospitals such as the Hospital involved here, rehabilitation hospitals, childrens' hospitals and long-term care hospitals, as well as distinct psychiatric or rehabilitation part units of general hospitals. § 1395ww(d)(1)(B). Such hospitals are exempt from the predetermined DRG/prospective payment system based on national averages because

> in general, the current DRG classification system does not adequately differentiate among the patients in these hospitals and units served. Currently, there is no standard patient classification system that can be used to differentiate patients in excluded hospitals and units according to their resource requirements.

---

**17.** The 1982 TEFRA amendment provided that § 1395ww(b) "shall not apply to cost reporting period of hospital beginning on or after October 1, 1985." Pub.L. No. 97–248, § 101, 96 Stat. 324, 333 (1982) (codified at 42 U.S.C. § 1395ww(b)(2)). This subsection was *repealed by* Social Security Act Amendments of 1983, Pub.L. No. 98–21, § 601(b)(4), 97 Stat. 150.

**18.** It appears that certain types of costs for section (d) hospitals continue to be reimbursed on a reasonable cost or modified reasonable costs basis, *see* 42 C.F.R. § 412.2(d).

56 Fed.Reg. 43232 (1991).[19] Although Congress has expressed an interest in bringing these hospitals into the prospective payment system applicable to general and acute care hospitals,[20] they continue to be exempt from that system and covered under the TEFRA provisions of section (b).

According to the Hospital, there are some 2,000 hospitals and units (including it, as a private psychiatric hospital) exempt from the prospective payment system under subsection (d)(1)(B), see Transcript of hearing, February 4, 1994 ("Tr.") at 5,[21] which represent some five percent (5%) of in-patient facilities providing services to Medicare-eligible patients and two percent (2%) of the costs of the Medicare system. Plaintiff's Second Revised Reply Memorandum, Dkt. #21 ("Pl. Reply Mem.") at 39–40.

This minority of hospitals and units of general hospitals, excluded from the prospective payment system under subsection (d)(1)(B) and interpreted by the Secretary as still governed for reimbursement payment by TEFRA, are referred to here as the "exempt hospitals."

*The "disproportionate share adjustment," § 1395ww(d)(5)(F)*

Effective May 1, 1986, Congress added § 1395ww(d)(5)(F) to the Medicare statute, requiring the Secretary to make additional adjustments for hospitals serving a "signifi-cantly disproportionate number of low-income patients with special needs" [22] (the "disproportionate share payment adjustment").[23]

In the regulation promulgated under that provision, the Secretary has interpreted the § 1395ww(d)(5)(F) adjustment as applicable to hospitals within the prospective payment system (that is, section (d) hospitals), *see* 42 C.F.R. § 412.106, but did not explicitly include hospitals exempt from that system such as the Hospital here. *See e.g., id.* at § 413.106(a)(ii).

## PROCEDURAL HISTORY

The Hospital contends that the fiscal constraints imposed by the Medicare provisions on exempt hospitals by the Secretary's method of computing its reimbursement under § 1395ww(b) and excluding it from a disproportionate share adjustment under subsection (d)(5)(F) has harsh results. The Hospital cites as one measure that its "target rates" for reimbursement with 1982 as its base year have increased by 56.3 percent while its "total allowable costs" have increased by 139.2 percent. Supplemental Affidavit of Thomas A. Luisi, Dkt. #17, at ¶ 2. According to the Hospital, reimbursement for hospitals under the prospective payment system (section (d) hospitals) is far closer to actual costs than for the exempt hospitals. Pl. Reply Mem. at 3, n. 1.

**19.** In a letter accompanying the Health Care Finance Administration's 1987 Report to Congress on the results of three years of studies on whether and how to bring the exempt hospitals into the prospective payment system, the Secretary noted as to psychiatric hospitals that "Numerous research studies conducted inside and outside of [the Department of Health and Human Services] confirm that the current psychiatric ... DRGs do not predict hospital resources. A study ... is exploring the feasibility of developing alternative DRGs and payment adjustments for psychiatric facilities." Affidavit of Frederick A. Nicoll, Dkt. #16, Exh. A at 2.

**20.** *See,* Pub.L. 101–508, § 4005(b) (1990), entitled "Development of National Prospective Payment Rates for Current Non PPS Hospitals," cited in Note to 42 U.S.C.A. § 1395ww (1993). The Secretary was to submit a proposal to Congress by April 1, 1992. *See also* Pub.L. 98–21, § 603(a)(2)(C)(ii) (1983).

**21.** Although a contradictory number of about 1,000 is expressed in the transcript at 11, a 1990 study using figures for 1987 suggests that 2,000 is the more reliable number. *See* Harrow and Cromwell, "Impact Analysis of the TEFRA System for Reimbursement of PPS–Excluded Hospitals," at 1–1 (Center for Health Economics Research, April 13, 1990), attached as Exh. B to Affirmation of Frederick A. Nicoll. According to that study, some 337,800 Medicare discharges were paid under TEFRA, of which psychiatric facilities represent some two-thirds of the excluded units and discharges. *Id.* at 1–2.

**22.** In general, hospitals deemed to have a substantial percentage of low-income patients, see § 1395ww(d)(5)(F)(i)(I), or meet the urban area, 100–bed, and fiscal criteria set forth in subsection (d)(5)(F)(i)(II).

**23.** Added by the Consolidated Omnibus Budget Reconciliation Act of 1985, Pub.L. No. 99–272, § 9105 (1986), codified at 42 U.S.C. § 1395ww(d)(5)(F).

The Hospital asserts that a steadily widening gap has been created not just within the Medicare system but also as between Medicare and Medicaid payments. For 1991, the Hospital was reimbursed $233 per day for Medicare and $449 for Medicaid. Pl.Mem. at 39.

The Hospital claims that it was underpaid by $295,619 [24] for the years 1985 through 1992 [25] even after adjustments of its target rates [26] for various years [27] because of the Secretary's invalid interpretation of two reimbursement provisions in § 1395ww. The Hospital claims in particular that

(1) the Secretary set forth an improper methodology in 42 C.F.R. § 413.20 for calculating the Hospital's payments by utilizing the adjusted cost based on prior years' method under section (b) of § 1395ww, instead of the actual reasonable cost provisions of § 1395f(b) and

(2) the Hospital was improperly excluded from additional adjustments for hospitals serving a "significantly disproportionate number of low-income patients with special needs," under subsection (d)(5)(F) of § 1395ww, as interpreted in 42 C.F.R. § 412.106.

In the alternative, the Hospital challenges the constitutionality of the statutes in question as violative of substantive due process and equal protection.

24. This amount, a reduction from the damages of some $930,000 claimed in the complaint, is the result of adjustments made following appeals of "target amounts" set by the Hospital's fiscal intermediary (*see* footnote 26 below) for the years 1989 and 1990. See Affidavit of Thomas A. Luisi, Plaintiff's Notice of Motion, Dkt. # 10 at ¶ 7. The Hospital claims that these appeals are unrelated to the issues raised in this action, *id.*, and apparently has not sought judicial review of their final determination. The Hospital also claims entitlement to a disproportionate share payment adjustment. The exact amount of damages allegedly suffered is not necessary to this memorandum decision and I make no findings as to their accuracy.

25. The Hospital claims that it only became aware of the reimbursement payment system being utilized by the Secretary in 1988, when its fiscal intermediary (*see* footnote 26 below) claimed an error had been made and demanded return of alleged overpayments. Pl.Reply Mem. at 5–6, n. 2.

On October 7, 1991, the fiscal intermediary for the Hospital issued a notice of Amount of Program Reimbursement for the Hospital's Medicare Cost Reporting Period ending December 31, 1989. The Hospital apparently did not appeal that decision. Instead, on February 20, 1992, the Hospital applied to the Department of Health and Human Services Provider Reimbursement Review Board (the "PRR Board") (see footnote 26 above) for expedited judicial review of the general questions of law presented here pursuant to 42 U.S.C. § 1395oo(f)(1), 42 C.F.R. § 405.-1842.

On May 8, 1992, the PRR Board issued its determination that no factual issues were in dispute and that it was without authority to decide the questions presented and granted the Hospital's application for expedited judicial review. In compliance with the statute, this complaint was filed within sixty days of the Hospital's notification of the PRR Board's decision.

## DISCUSSION

Congress has long been concerned about the spiraling costs of Medicare, *see Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984), and sought to implement its concern through several major and minor amend-

26. Under Medicare, hospital reimbursements are initially computed and ultimately paid through a fiscal intermediary, *see* § 1395h, in this case Traveler's Insurance Co. The fiscal intermediary's final reimbursement determinations under § 1395ww(b) may be appealed to a the Department of Health and Human Services Provider Reimbursement Review Board (the "Board"), whose decision is final unless the Secretary reverses, affirms, or modifies the Board's decision within 60 days of notification of the provider of services. *See* § 1395oo (f)(1). Judicial review under 5 U.S.C. Chapter 7 is available for such final decisions, as well as final determinations of the Board as to questions of law or regulations relevant to matters in controversy, as in this case, or of the Secretary. *Id.*

27. *See* Administrative Records of the PRR Board concerning the request for Expedited Judicial Review by the Hospital for fiscal year ending December 31, 1989, Defendant's Notice of Cross–Motion, Dkt. # 14, Exh. A.

ments to 42 U.S.C. § 1395ww, the statute governing payments to hospitals for inpatient hospital services. Under *Chevron,* where a statute unambiguously expresses the intent of Congress, the court and the agency must give effect to that intent; where a statute is "silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.; see Motor Vehicle Manufacturers Ass'n v. New York State Dep't of Environmental Conservation,* 17 F.3d 521 (2d Cir.1994).

■ An agency's interpretation is ordinarily entitled to deference, unless a regulation is " 'manifestly contrary' " to the statute, *New York City Health and Hospitals v. Perales,* 954 F.2d 854, 858 (2d Cir.) (quoting *Chevron,* 467 U.S. at 844, 104 S.Ct. at 2782), *cert. denied,* —— U.S. ——, 113 S.Ct. 461, 121 L.Ed.2d 369 (1992). In determining whether the Secretary acted appropriately under § 1395oo(f)(1), which incorporates the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), a court will set aside only agency actions that are found to be "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." *Id.*

### Claims under § 1395ww(b) (TEFRA)

■ I turn first to the Hospital's challenge to the regulation promulgated under section (b), 42 C.F.R. § 413.40. Section (b) provides for calculating costs under the TEFRA system of adjusted cost based on prior years, target amounts, and incentives and penalties based on a hospital's performance in each cost-reporting period. By its own terms, section (b) clearly applies to the exempt hospitals[28] but the Hospital contends that the opening language supports its argument that, when the prospective payment system went into effect, the exempt hospitals reverted back to the reasonable cost system set forth in § 1395f(b) with section (b) as a supple-

ment, adding bonuses or penalties in relation to reasonable actual costs.

The provisions involved do not support the Hospital's construction. Section (b) of § 1395ww states in its first sentence: "Notwithstanding section 1395f(b) of this title but subject to the provisions of section 1395e[29] of this title ..." It plainly provides that *despite* the reasonable costs provisions, the exempt hospitals will no longer be subject to that provision but only to section 1395e. Section 1395f(b) adds weight to this interpretation by stating that payments under it are "subject to the provisions of sections 1395e and 1395ww of this title...." This, taken together with the language in section (b), which is part of section 1395ww, makes it clear that section (b) supersedes the reasonable costs provisions for hospitals such as the Hospital here that are excluded from section (d) under (d)(1)(B) (the exemption provision).

■ The Hospital also takes issue with the Secretary's interpretation of the terminology used in TEFRA subsection (b)(3)(A), which reads in relevant part:

... the term "target amount" means, with respect to a hospital for a particular 12–month cost reporting period—

(i) in the case of the first such reporting period for which this subsection is in effect, the allowable operating costs of inpatient hospital services (as defined in subsection (a)(4) of this section) recognized under this subchapter for such hospital for the preceding 12–month cost reporting period, and

(ii) in the case of a later reporting period, the target amount for the preceding 12–month cost reporting period,

increased by the applicable percentage increase ... for that particular cost reporting period.

The Hospital would read the "allowable operating costs" set forth in § 1395ww(a)(4)[30] to be the amount of reason-

---

**28.** Subsection (b)(1) states in relevant part "... a hospital (other than a subsection (d) hospital, as defined in subsection (d)(1)(B) ... of this section)...." The latter provision defines the exempt hospitals.

**29.** Section 1395e is entitled "Deductibles and coinsurance"; its provisions are not relevant to this ruling.

**30.** "... the term 'operating costs of inpatient hospital services' includes all routine operating costs, ancillary service operating costs, and spe-

able costs based on an "average cost per discharge," Tr. at 4, from which to calculate its annual target amounts, rather than using such costs as a starting point for further computation, as required under section (b). The language of the provisions involved, however, does not sustain the Hospital's reading; subsection (a)(4) is referred to both in the title to section (a) and in subsection (b)(1) and (3) as one of definition.

The words of these provisions leave little doubt that subsection (a)(4) lists the basic basket of reimbursable services determined on an "average" per case basis, while the time frame (a 12–month period) and computing method utilizing the figure from subsection (a)(4) are set forth in subsection (b)(3)(A). The inclusion of "Computation of payment" in the title for section (b) and the reference to subsection (a)(4) in subsection (b)(3)(A) as one of definition together indicate that subsection (a)(4) is not intended to be independently available for computation purposes.[31]

■ As to § 1395ww(b) itself, the Hospital argues that in interpreting "target amount" as used in subsections (b)(1) and (b)(3)(A), the Secretary improperly introduced into the regulation, 42 C.F.R. § 413.40, the terms "ceiling" and "base period," which appear nowhere in the statutory provision quoted above. The regulation refers to a target amount as "a ceiling on the rate of increase of operating costs per case for inpatient hospital services that will be recognized as rea-

sonable for purposes of determining Medicare reimbursement," *id.* at § 413.40(a)(1), and subsequently uses the terms "ceiling" and "target amount" interchangeably, *see, e.g., id.* at § 413.40(c)(4). This appears to be a permissible interpretation consistent with the language of the statute, which places a limit on reimbursements within each cost-reporting period at least as an initial starting point, subject to incentives, penalties, and adjustments as appropriate.[32]

The Hospital's contention that the Secretary impermissibly defines "base year" to mean a fixed amount (for the Hospital, the allowable costs of 1982 as adjusted) rather than one grounded in each successive year's actual reasonable costs, is equally insupportable. The use of the words "the preceding 12–month cost period" in the statute as the predicate for determining amounts includable in the immediate next such period (i.e., the first period for which the subsection is in effect), combined with the reference in subsection (b)(3)(A)(ii) to the preceding period, indicate that the third year of the process will rest on the second year which rested on the first year—that is, that the first year becomes incorporated into all future calculations, unless modified pursuant to the adjustment provision, subsection (b)(4)(A), sentence 2. The term "base period" cannot be said to be inconsistent with the language in the statute or its purpose.[33]

While Congress does not appear to have permitted the exempt hospitals to revert to

---

cial care unit operating costs with respect to inpatient hospital services as such costs are determined on an average per admission or per discharge basis (as determined by the Secretary) ..." § 1395ww(a)(4). All other subparagraphs of § 1395ww(a) have expired pursuant to subsection (a)(1)(D).

**31.** Subsection (a)(4) is also referred to in subsection (d)(1)(A), in that case as a predicate for calculating reimbursement payment under the prospective payment system. Thus, although the sole surviving provision of section (a), it has an interrelationship with other aspects of the statute.

**32.** Although originally providing that section (b) would expire for periods beginning on or after October 1, 1985, Congress repealed this portion of section (b), see citation in footnote 17 above. Thus, *section (b) continues to apply to the ex-*

empt hospitals. *See Tucson Medical Center v. Sullivan,* 947 F.2d 971, 975 n. 5 (D.C.Cir.1991).

**33.** The term "base cost reporting period" is used in subsections (b)(3)(C), (D), and (E), which are applicable to certain other types of hospitals, but is not used in subsection (b)(3)(A), the provision covering the exempt hospitals. The Hospital asserts that the term therefore is not intended to be applicable to the exempt hospitals.

However, the identical wording is used in all four subsections to describe what is meant by that term, namely the 12–month cost reporting period "preceding" the first 12–month reporting period for which the subsection is in effect. Subsections (b)(3)(C), (D), and (E) were added in 1989 by Pub.L. 101–239, § 6004(b)(3)(C), (D), (E) (1989), after subsection (b)(3)(A), which was part of the original statute, and promulgation of the regulation using the term "base period."

the actual reasonable cost provisions of the pre–1983 period and there is no basis for finding the regulation an invalid interpretation of the TEFRA mechanism, the legislation recognizes the difficulties inherent in the possible rigidities of the system created by TEFRA. As a corrective, Congress in subsection (b)(4)(A) directed the Secretary to consider various exceptions and adjustments which, when utilized to the extent possible, should provide the Hospital with appropriate relief, as explained more fully below.

*The Disproportionate Share Adjustment Claim*

■ Before reaching the issue of relief, I turn to the special treatment available to hospitals whose Medicare patients include a substantial proportion of low-income patients as set forth by the Secretary in the regulation promulgated under § 1395ww(d)(5)(F). 42 C.F.R. § 413.106. The Hospital's claim that the Secretary incorrectly excludes the exempt hospitals from the disproportionate share adjustment as such cannot survive close scrutiny of the first sentence of subsection (d)(5)(F)(i), which refers to "an additional payment amount for each [section] (d) hospital" which meets certain criteria. Section (d) excludes psychiatric hospitals in subsection (d)(1)(B).

The reference to section (d) hospitals in subsection (d)(5)(F)(i) is the predicate for the definition of two types of hospitals to which the adjustment is available. The Hospital would have me read the language in subsection (d)(5)(F)(iv), referring to hospitals not described in clause (d)(5)(F)(i)(II), as an avenue for bringing the exempt hospitals back into the provision so as to make the adjustment set forth there available to them. But such a reading cannot be supported by the plain language of subsection (d)(5)(F)(i); no part of subsection (d)(5)(F) can be read in isolation from its first sentence, ". . . an additional amount for each [section] (d) hospital. . . ."

While the regulation is not straightforward in specifying that only section (d) (non-exempt) hospitals are eligible for the disproportionate share adjustment available under subsection (d)(5)(F), it uses terminology applicable only to payment calculations under the prospective payment system, *see, e.g.,* 42 C.F.R. § 412.106(a)(ii). In light of the specific language of subsection (d)(5)(F)(i), it cannot be said that, by excluding the exempt hospitals even implicitly, the regulation at issue is "at odds with the clear intent" or legislative purpose of the statute, *New York City Health and Hospitals v. Perales,* 954 F.2d 854, 858 (2d Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 461, 121 L.Ed.2d 369 (1992), or that the regulation offers an impermissible, arbitrary or capricious interpretation. *See Heckler v. Campbell,* 461 U.S. 458, 466, 103 S.Ct. 1952, 1956, 76 L.Ed.2d 66 (1983).

Nor is there a basis for finding that excluding the exempt hospitals from the disproportionate share adjustment under subsection (d)(5)(F) qualifies this as a case of " 'sheer inadvertence in the legislative process,' " *Cass v. United States,* 417 U.S. 72, 83, 94 S.Ct. 2167, 2173, 40 L.Ed.2d 668 (1974) (citation omitted).[34] Here, there is a complex statute providing different reimbursement schemes for two categories of hospitals, and the scheme applicable to the plaintiff Hospital provides for adjustments on the basis of multiple, non-exclusive factors under subsection (b)(4)(A) (the adjustment provision). The relief that may be available to the Hospital[35] under the adjustment provision is discussed more fully below.

*Constitutional Issues*

■ The only potential substantial constitutional question raised by the Hospital is a claim of confiscation treated as prohibited by the Due Process Clause of the Fifth Amendment even though more explicitly enshrined in the Takings Clause of the same amendment. Were the Hospital compelled to participate in the Medicare program but not adequately reimbursed for the cost of doing so, which may exist in certain limited circum-

---

**34.** The Hospital points out that adjustments for low income patients were available in the reasonable cost system, *see* § 1395f(b) and the short-lived transitional reimbursement scheme for all hospitals under § 1395ww(a)(2)(B).

**35.** For purposes of this decision, I assume without finding that the Hospital treats a substantial number of low-income patients.

stances under the so-called "anti-dumping" provisions of § 1395dd or possible state provisions but which has not been presented in the current litigation, a taking of private property for public use without just compensation in violation of the Takings Clause might be involved. *See generally Lucas v. South Carolina Coastal Council,* —— U.S. ——, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992); *Penn Central Transportation Co v. City of New York,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). In any event the remedy provided by the statute has not been sought in full and is sufficient to avoid a constitutional challenge to the statute as discussed below.

■ The Hospital's substantive due process argument is otherwise contrary to the text, history and purposes of the Due Process Clause of the Fifth Amendment. Participation involved here is not compulsory and the Hospital has elected to contract with the government. *See* § 1395a (any individual entitled to Medicare benefits may obtain services from any qualified institution "if such institution .. undertakes to provide him such services."); Complaint at ¶ 10.

The Due Process Clause of the Fifth Amendment does not guarantee anyone the right to have the government offer types of contracts which will be remunerative or even practical to accept. *See generally Tennessee Electric Power Co. v. Tennessee Valley Authority,* 306 U.S. 118, 59 S.Ct. 366, 83 L.Ed. 543 (1939); *Perkins v. Lukens Steel Co.,* 310 U.S. 113, 60 S.Ct. 869, 84 L.Ed. 1108 (1940).

Public demand may, but the Fifth Amendment Due Process Clause does not, require Congress to establish federal programs for health care assistance, much less a particular type such as that created by the Medicare Act. No such program existed from the time the Amendment was ratified as part of the Bill of Rights in 1791 until more than 170 years later in 1966.

Neither providers to nor beneficiaries of government programs have a due process right to insist that public monies be expended for a particular goal or so as to permit a

particular contractor to find it profitable to participate in a federal program.

There is no basis for any claim that any legitimate expectation created by contract, regulation or statute has been frustrated. The fact that Congress hoped that the Secretary would come up with an improved overall reimbursement system, *see* Pub.L. 101–508, § 4005(b) (1990), Note to 42 U.S.C.A. § 1395ww (1993), entitled "Development of National Prospective Payment Rates for Current Non PPS Hospitals," does not assure anyone that the effort would be successful.

■ The Hospital's equal protection claim [36] based on the use of TEFRA rather than diagnostic-based initial reimbursement calculations must fail because Congress could reasonably find that standardized diagnoses and lengths of stay are even more difficult to quantify in the psychiatric field than in physical medicine. *See* American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* (3d ed., revised 1987) (DSM–IIIr). Congress could treat such hospitals differently from hospitals concerned primarily with acute general physical ills.

■ "In the area of economic and social welfare legislation, a State does not violate the Equal Protection Clause merely because the classification made by its laws are imperfect." *Dandridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970). If the classification "has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.'" *Id.* at 485, 90 S.Ct. at 1161 (quoting *Lindsley v. Natural Carbonic Gas Co.,* 220 U.S. 61, 78, 31 S.Ct. 337, 340, 55 L.Ed. 369 (1911)). Where social and economic legislation does not use invidious or suspect classifications or intrude on fundamental rights, it must be "rationally related to a legitimate governmental purpose," *Hodel v. Indiana,* 452 U.S. 314, 331, 101 S.Ct. 2376, 2387, 69 L.Ed.2d 40 (1981). Such government regulation "carries with it a presumption of rationality than can only be overcome by a clear showing of arbi-

36. *See* footnote 38 below.

trariness and irrationality." *Id.* at 331–32, 101 S.Ct. at 2387 (citations omitted); *Pinnacle Nursing Home v. Axelrod,* 928 F.2d 1306, 1317 (2d Cir.1991).

## CONCLUSIONS

■ Under § 1395ww(b)(4)(A) (the "adjustment provision"), hospitals are entitled to have the Secretary modify the restrictive impact of reimbursement criteria based on historical costs even though adjusted by increments that bear little or no relation to reasonable and necessary actual costs.[37] The statute provides:

> The Secretary *shall* provide for an exemption from, or an exception and adjustment to, the [adjusted cost based on prior years] method ... where events beyond the hospital's control or extraordinary circumstances, including changes in the case mix of such hospital, ... create a distortion in the increase in costs for a cost reporting period (including any distortion in the costs for the base period against which such increase is measured).

(emphasis added). In 1990, Congress added sentence 2, which reads in relevant part:

> The Secretary may provide for such other exemptions from, and exceptions and adjustments to, such method as the Secretary deems appropriate, *including* the assignment of a new base period which is more representative, as determined by the Secretary, of the reasonable and necessary cost ...

(emphasis added). This provision, while self-executing, is reflected in 42 C.F.R. § 413.-40(f)–(h).

The presence of this provision as part of the statutory structure modifies all other statutory provisions and regulations under them. Accordingly none of the regulations can be read to impose unreasonable restrictions on reimbursement for medically necessary services provided to qualified Medicare beneficiaries and hence even apart from other considerations do not violate the statute or the Constitution.

The existence of the statutory remedy both makes the Hospital's assaults on other aspects of the statute and regulations premature, and requires the Secretary on proper application to make such adjustments as may be required to insure that hospitals be compensated adequately to permit them to perform their functions in the public interest. The adjustment provision in sentence 2 states that the Secretary "may provide for such other ... exceptions and adjustments to [the method under this section for determining the amount of payment to a hospital] ... as the Secretary *deems appropriate* ..." (emphasis added). Such adjustment would be "appropriate" if required by the Constitution or the objectives of the Medicare statute, which are to permit hospitals to care for patients effectively and, at the same time, to avoid excessive financial burdens on the Medicare program caused by unnecessary or inflated costs.

The regulation promulgated under the adjustment provision includes a general rule permitting adjustment of "the amount of operating costs considered in establishing the rate-of-increase ceiling for one or more cost reporting periods, including both periods subject to the ceiling and the hospital's base year" under specified circumstances, 42 C.F.R. § 413.40(g)(1), as well as guidelines for seeking assignment of a new base period, *id.* at § 413.40(h)(4)(i). The non-exclusive definitions of "extraordinary circumstances," *id.* at (g)(2), and factors to be considered where a Hospital claims an adjustment is needed for "significant distortion in the operating costs between the base year and the cost reporting period subject to the limits," *id.* at (g)(3)(i) include "unusual costs ... beyond the hospital's control," *id.* at (g)(2), and necessarily include increases in "service intensity or length of stay attributable to changes in the type of patient served." *Id.* at (g)(3)(ii)(D).

---

37. This phenomenon has frequently arisen in connection with price controls which lead to shortages where not adjusted to changes in actual—not merely projected—costs. See Civilian Production Administration, 1 *Industrial Mobili-* *zation for War* 730–36 (Historical Reports on War Administration, General Study No. 1, 1947); A. Hart, *Defense Without Inflation* ch. 4 at 65 (20th Century Fund 1951).

*Disproportionate Share of Low–Income Patients*

With respect to additional payment for treating a substantial number of low-income Medicare patients, the adjustment provision in § 1395ww(b) deals in different language with the same factual problem of a substantial proportion of low-income patients. Sentence one of subsection (b)(4)(A) mentions, for example, "case mix," which clearly includes the concept of "significant disproportionate number of low-income patients," (d)(F)(i)(I), as does the Secretary's inclusion, as noted above, of increases in "service intensity or length of stay attributable to changes in the type of patient served." 42 C.F.R. § 413.40(g)(3)(ii)(D). The more general provision in sentence two that the Secretary "may provide for such ... adjustment ... as the Secretary deems appropriate," (b)(4)(A), sentence two, also would take into account proportion of patients whose costs are only met by government programs that would support payment to hospitals of less than would be otherwise obtainable.[38]

*The Adjustment Provision and Statutory Objectives*

Availability of adjustment under 42 U.S.C. § 1395ww(b)(4)(A) does not preclude vigorous and where appropriate painstaking auditing of claimants for public monies to insure that costs charged to the taxpayer are both necessary and reasonable. Such auditing may seek to insure diagnostic labels or unnecessary extension of hospitalization such as may have tended to occur prior to TEFRA are not used to upgrade monetary claims even where these are not directly keyed into reimbursement targets. *See, e.g.,* 42 C.F.R. § 413.40(g)(ii)(F) (an adjustment factor where discharges are manipulated to increase reimbursement).

The Secretary must consider all of the factors in the adjustment provision whether or not repeated in the regulation. Regulations complement statutes by providing additional guidance and need not provide repetitious statements of matters already covered in the statute, which are, of course, fully effective whether repeated or not. Failure of a regulation to repeat material set forth by Congress does not implicitly repeal the statute nor is it necessarily inconsistent with the adjustment provision.

While the regulation states at 42 C.F.R. § 413.40(g)(1), "[the Health Care Finance Administration] may adjust the amount of operating costs ...," this cannot and does not purport to replace the language in the adjustment provision, § 1395ww(b)(4)(A), that "The *Secretary shall* provide ... an exemption and adjustment to, the method ..." This mandatory language requires the Secretary to consider all factors set forth in the provision as well as those specified in the regulation.

If truly necessary and reasonable costs are not taken into account, providers will "refrain from treating the most vulnerable of the elderly and disabled, those who are also poor." *New York City Health and Hospitals v. Perales,* 954 F.2d 854, 859 (2d Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 461, 121 L.Ed.2d 369 (1992). While standing alone this is not a sufficient reason for our construction of the statute, it is relevant to its interpretation to achieve its purpose. The position taken here is not, as Judge Cardamone stated was the case with the result in *Perales,* contrary to "the views of ... federal administrative officers" who are parties to the suit, *id.* at 863 (Cardamone, J., dissenting). The government has never taken a position contrary to the construction set forth herein.

The twin needs for cost control and provision of services can be met by careful review of both individualized and generalized benchmarks for (a) actual and (b) medically required costs.

*Prior Years*

The Hospital's papers do not provide sufficient information as to any such application that has yet been made to the Secretary for any year at issue, with the possible exception of the target amounts for 1988 and 1989, nor that judicial review was sought under

---

**38.** To the extent that the Hospital's equal protection claim is aimed at the disproportionate share issue, this claim is inapplicable since a remedy is available to both categories of hospitals under different rubrics.

§ 1395oo (f), sentence 1, of that adjustment or of any other requests denied by the PRR Board.

The Hospital has the right under the statute to make application to the Secretary for any year still open to adjustment.[39] If the Secretary fails to grant appropriate relief under the statutory adjustment procedure, review of any final action under the statute may be had under the Administrative Procedure Act, 5 U.S.C. § 702, which waives any otherwise applicable sovereign immunity. See *United States v. Mitchell,* 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983); *Platsky v. CIA,* 953 F.2d 26, 28 (2d Cir.1991).

*RELIEF*

Although the relief specifically requested by the Hospital need not be considered in the light of the adjustment remedy, it is critical to the objectives of the statute that the hospitals be certain of the meaningful availability of that remedy in order that they be able to proceed confidently to provide their critical services. Consequently, declaratory judgment under 28 U.S.C. §§ 2201–2202 is granted defining the meaning of the relevant statutes and regulations to the extent set forth in this memorandum order in order to settle these relationships between the parties. See *Continental Casualty Co. v. Coastal Savings Bank,* 977 F.2d 734 (2d Cir.1992).

Availability of both administrative and judicial review avoids difficult constitutional questions which might otherwise be presented. See *Webster v. Doe,* 486 U.S. 592, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988); *Lindahl v. O.P.M.,* 470 U.S. 768, 105 S.Ct. 1620, 84 L.Ed.2d 674 (1985); *Oestereich v. Selective Service Board,* 393 U.S. 233, 238, 89 S.Ct. 414, 416, 21 L.Ed.2d 402 (1968); *Leedom v. Kyne,* 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958); see also *Adamo Wrecking Co v. United States,* 434 U.S. 275, 98 S.Ct. 566, 54 L.Ed.2d 538 (1978); *Philadelphia Co. v. Stimson,* 223 U.S. 605, 619–20, 32 S.Ct. 340, 344, 56 L.Ed. 570 (1912) (Hughes, J.). Under these circumstances, there is no due process or equal protection violation.

---

**39.** The extent if any to which portions of the adjustment provision may be applicable to only some cost-reporting periods, or the appropriate

Injunctive relief is not necessary, inasmuch as this Court may assume that the Secretary will implement the statutory procedure for adjustments where indicated by the facts, her obligation to do so having been declared.

The parties are directed to settle a final declaratory judgment on five (5) days' notice or waiver of notice.

**SO ORDERED.**

procedure for seeking administrative review, need not be reached for purposes of this ruling.