RYE PSYCHIATRIC HOSPITAL CENTER, INC., Plaintiff–Appellee–Cross Appellant,

v.

Donna E. SHALALA, Secretary, United States Department of Health and Human Services, Defendant–Appellant–Cross Appellee.

Nos. 921, 1253, Dockets 94–6172, 94–6198.

United States Court of Appeals, Second Circuit.

Argued Jan. 20, 1995.

Decided April 10, 1995.

Frederick A. Nicoll, New York City, for plaintiff-appellee-cross appellant.

Nancy L. Savitt, Asst. U.S. Atty. S.D.N.Y. (Mary Jo White, U.S. Atty., Steven M. Haber, Asst. U.S. Atty. S.D.N.Y., of counsel), for defendant-appellant-cross appellee.

---

* Lewis A. Kaplan, United States District Judge for the Southern District of New York, sitting by designation.

1. *See* H.R.Conf.Rep. No. 861, 98th Cong., 2d Sess. 1356 (1984), *reprinted in* 1984 U.S.C.C.A.N.

Before: NEWMAN, Chief Judge, MINER, Circuit Judge, and KAPLAN, District Judge.*

KAPLAN, District Judge.

Since the 1960s, the Social Security Act's Medicare provisions, 42 U.S.C. §§ 1395–1395ccc (1988) ("Medicare"), have reimbursed hospitals and other providers for many of the costs of medical care provided to qualifying persons. This case concerns the relationship between two of the hospital cost reimbursement provisions of Medicare.

The prospective payment system ("PPS"), established pursuant to the Social Security Amendments of 1983, requires the Secretary of the Department of Health and Human Services (the "Secretary") to increase payments to hospitals covered by PPS that treat a disproportionate number of low-income patients (the "Disproportionate Share Adjustment" or "DSA"). 42 U.S.C. § 1395ww(d)(5)(F). This reflects a Congressional judgment that low-income patients frequently are in poorer health, and therefore cost more to treat, than others.[1] Given the structure of the PPS reimbursement system, which bases reimbursement on national and regional average costs for the treatment of particular diseases, the lack of such an adjustment would penalize hospitals treating disproportionate numbers of low-income patients.

Plaintiff Rye Psychiatric Hospital Center, Inc. ("Rye") is not subject to PPS. Its Medicare reimbursements are governed instead by provisions first enacted in the Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA"). Unlike PPS, the structure of the TEFRA reimbursement system takes into account the presumptively higher cost of treating low-income patients in setting the base reimbursement rate. Thus, while TEFRA provides for adjustment in the reimbursement rates paid to Rye and other TEFRA hospitals for distortions caused by

1445, 2044; S.Rep. No. 23, 98th Cong., 1st Sess. 54 (1983), *reprinted in* 1983 U.S.C.C.A.N. 143, 194; *Samaritan Health Center v. Heckler*, 636 F.Supp. 503, 508 (D.D.C.1985).

events beyond their control or by extraordinary circumstances, 42 U.S.C. § 1395ww(b)(4)(A), it does not contain a DSA, i.e., a required adjustment based solely on the proportion of low-income patients treated. Accordingly, a regulation adopted by the Secretary limits DSAs to hospitals that are subject to PPS. *See* 42 C.F.R. § 412.106(a)(1)(ii) (1993) (limiting consideration to "patient days attributable to areas of the hospital that are subject to [PPS] and exclud[ing] all others").

Rye brought this action for, *inter alia*, a declaration that the regulation excluding TEFRA hospitals from receiving DSAs conflicts with the statute—in other words, that the statute entitles Rye to a DSA—or, alternatively, that the statute deprives Rye of the equal protection of the laws. The District Court, on cross-motions for summary judgment, rejected Rye's contention that 42 U.S.C. § 1395ww(d)(5)(F) requires payment of the DSA to Rye. It nevertheless ruled that the adjustment provision of TEFRA, 42 U.S.C. § 1395ww(b)(4)(A), which requires the Secretary to adjust reimbursements to Rye and other TEFRA hospitals where changes in "the case mix of such hospital[s]," among other factors, create a distortion in cost increases, compels the Secretary to adjust reimbursements to Rye on substantially the same basis as if Section 1395ww(d)(5)(F) applied directly. *Rye Psychiatric Hospital Center, Inc. v. Shalala,* 846 F.Supp. 1170 (S.D.N.Y.1994). It did so on the theory that the term "case mix" in 42 U.S.C. § 1395ww(b)(4)(A) "includes the concept of a 'significantly disproportionate number of low-income patients' as defined in 42 U.S.C. § 1395ww(d)(5)(F)."

The Secretary appeals from the declaration requiring application of the substance of the DSA under Section 1395ww(b)(4)(A). Rye cross-appeals from the District Court's determination that Section 1395ww(d)(5)(F) does not directly require payment of the DSA to Rye.

The District Court correctly held that Section 1395ww(d)(5)(F) does not require payment of the DSA to TEFRA hospitals like Rye. Its conclusion that the Secretary is obliged to apply the substance of the DSA

under Section 1395ww(b)(4)(A), however, fails to give due regard to either the statutory language or the fundamentally different structures of the TEFRA and PPS reimbursement systems. Indeed, a DSA in the context of the TEFRA reimbursement system is unnecessary to take appropriate account of the higher cost of treating low-income patients and, in some circumstances, would lead to overreimbursement. Rye's constitutional challenges are without merit. Accordingly, we affirm the District Court's holding that Rye is not entitled to a Disproportionate Share Adjustment under Section 1395ww(d)(5)(F). We reverse the determination that the Secretary is obliged by Section 1395ww(b)(4)(A) to adjust reimbursement rates based solely on the proportion of low-income patients served by a TEFRA hospital.

*Statutory and Regulatory Framework*
*The Original Reasonable Cost System*

At its inception, Medicare reimbursed hospitals primarily through a retrospective, reasonable cost system. At the end of each fiscal year, hospitals reported the total costs for which they sought reimbursement. These were subject to audit. *See generally Tucson Medical Center v. Sullivan,* 947 F.2d 971, 973–74 (D.C.Cir.1991). Reimbursement was limited to reasonable or necessary charges. 42 U.S.C. § 1395f(b)(1) (1988). The Secretary was given broad discretion to eliminate costs "unnecessary in the efficient delivery of needed health services." 42 U.S.C. § 1395x(v)(1)(A) (1988).

The reasonable cost system, Congress soon concluded, did not provide hospitals with sufficient incentives to be efficient. Because the reasonable cost system was an actual cost system, "[t]he more [hospitals] spent, the more they were reimbursed." *Tucson Medical Center,* 947 F.2d at 974. In consequence, Congress in 1972 authorized the Secretary to impose prospective limits on certain costs. Social Security Amendments of 1972, Pub.L. No. 92–603, § 223(b), 86 Stat. 1329, 1393 (1972). The Secretary thereupon established a schedule of reimbursable and non-reimbursable expenses in 1974. *See* 42 C.F.R. § 413.30 (1993).

*The TEFRA System*

By the early 1980s, Congress concluded that the reasonable cost system, even supplemented by the Secretary's schedule, did not curb costs sufficiently and sought more control. Its first step was the enactment in 1982 of the TEFRA reimbursement system, which was intended to remain in effect for up to three years while the Secretary developed a prospective reimbursement system. *Tucson Medical Center,* 947 F.2d at 974–75; Pub.L. No. 97–248, 96 Stat. 324 (1982), *codified in* 42 U.S.C. § 1395ww(b) (1988). Although most hospitals now are covered by the PPS, which became effective in 1983, Rye still is covered by TEFRA for reasons discussed below.

The initial step in fixing a TEFRA hospital's entitlement to reimbursement, generally speaking, is to determine its total "allowable costs" for a base year. 42 C.F.R. § 413.40(b)(1) (1993); *Tucson Medical Center,* 947 F.2d at 975. Reimbursements in subsequent years, however, do not depend on total or allowable costs incurred in those subsequent years. Rather, a maximum permissible reimbursement, or "target amount," for each subsequent period is established by multiplying the figure for the base year by a legislatively determined percentage.[2] 42 U.S.C. § 1395ww(b)(3) (1988); 42 C.F.R. § 413.40 (1993). If a hospital expends more than its target amount, or ceiling, it is reimbursed only up to the amount of the ceiling. If its costs are less than its ceiling, it is given a bonus payment of half the difference between its costs and the ceiling. 42 U.S.C. § 1395ww(b)(1)(A) (1988); 42 C.F.R. § 413.40 (1993); *see generally Connecticut Hospital Association v. Weicker,* 46 F.3d 211, 214–15 (2d Cir.1995) (hereinafter "*CHA*").

Absent successful application for an adjustment, as outlined below, the target amount so determined is the maximum Medicare reimbursement that a TEFRA hospital may receive for any given year. How fully a TEFRA hospital is reimbursed from year to year thus depends on (1) how representative its base period is of its actual total costs in the relevant year, and (2) how closely the Congressionally fixed percentage increase

mirrors any increase in the hospital's costs. If a hospital's actual total costs equal its costs in the base period plus the statutory increase, it will be fully reimbursed. If a TEFRA hospital's actual total costs in any given year differ from the costs in the base period plus the statutory increase, however, its reimbursement may either fall short of or exceed its actual total costs. Thus, TEFRA seeks to reward hospitals that spend less than the target amounts and penalize those that spend more.

Congress recognized that a variety of circumstances might prevent the target amount from reflecting fairly the costs for which a hospital should be reimbursed. TEFRA therefore allows for adjusting reimbursement amounts "where events beyond the hospital's control or extraordinary circumstances, including changes in the case mix of such hospital, create a distortion in the increase in costs for a cost reporting period...." 42 U.S.C. § 1395ww(b)(4)(A) (1988). *See generally CHA,* 46 F.3d at 214–15. The regulations adopted under Section 1395ww(b)(4)(A) permit two types of adjustments.

Under 42 C.F.R. § 413.40(g), the Secretary may adjust the amount of operating costs considered in establishing the ceiling, including both the base period and any subsequent period, to take account of (1) extraordinary events such as fires, floods, strikes and other events that might increase costs, and (2) certain economic changes that might distort operating costs between the base year and the year in which a particular cost ceiling is imposed. For example, under 42 C.F.R. § 413.40(g)(3)(ii)(D) (1993), an "[i]ncrease[ ] in service intensity or length of stay attributable to changes in the type of patient served" compared with the base period is a basis for an adjustment.

Section 413.40(i) of the regulation, which applies to years beginning after 1990, permits the Secretary to assign a new base period if, among other things, the new base period is more representative of the costs of providing services as a result of substantial and permanent changes in furnishing care.

---

**2.** The statutory percentages used to calculate the target rates are intended to reflect primarily cost increases attributable to inflation. *See* 56 Fed. Reg. 43,229 (Aug. 30, 1991).

Because the base period is the starting point for the determination of all subsequent ceilings, changing the base period affects all future target amount calculations of the hospital, not merely that of a particular year.[3]

Reimbursement and adjustment for TEFRA hospitals such as Rye occurs every twelve months following a hospital's submission of a summary of the past year's costs to a fiscal intermediary. *See* 42 C.F.R. §§ 405.1801(b)(1), 413.24(f) (1993). The intermediary reviews the report to determine what part of the claim is reimbursable under the statute and regulations and then issues a "notice of program reimbursement," or "NPR," which sets forth the final payment for the year. *Tucson Medical Center,* 947 F.2d at 974.

The hospital may claim an adjustment either in its initial submission to the intermediary or within 180 days after the NPR is issued. An intermediary, unless authorized by the Health Care Financing Administration ("HCFA"), cannot rule on the adjustment request. It instead must send the request to HCFA for review. 42 C.F.R. § 413.40(e) (1993).

After receiving a final decision on reimbursement and adjustments, the hospital may appeal to the Provider Reimbursement Review Board (the "Board"), an administrative body established to hear such challenges, and ultimately to an appropriate District Court. 42 U.S.C. §§ 1395oo(a), 1395oo(f)(1) (1988); 42 C.F.R. §§ 405.1835, 405.1875 (1993). If the Board determines that an issue raised is one that the Board lacks authority to decide, such as the validity of a regulation, the hospital may seek immediate judicial review of the question. 42 U.S.C. § 1395oo(f)(1) (1988).

*The Prospective Payment System*

The PPS marked a major departure in Medicare reimbursement policy. It established a number of Diagnostically Related Groups ("DRGs"), which describe particular classes of patients and treatments, and the amount Medicare will pay for each. DRG cost schedules are generated from anticipated national and regional average costs for the treatment of particular illnesses. 42 U.S.C. § 1395ww(d)(2)(D) (1983).[4]

This system differs substantially from TEFRA. In focusing on national and regional averages for the cost of treating particular illnesses, it is not based on the cost to any particular hospital of treating particular DRG-classified illnesses.

The PPS uses two methods to deal with costs not adequately captured by the DRGs. First, a number of illnesses and treatments, including psychiatric care, are regarded as so inherently unpredictable that they cannot be categorized adequately within the DRG system. 56 Fed.Reg. 43,232 (1991). Hospitals or units of hospitals that treat such illnesses, like Rye, therefore are excluded from the PPS and instead continue to be reimbursed under TEFRA, which is based on the hospitals' past costs and does not require classification of patients into illness-based DRGs. *See* 42 U.S.C. §§ 1395ww(b), 1395ww(d)(1)(B) (1988); 42 C.F.R. §§ 412.20(b)–412.30 (1993).

Second, the PPS statute and regulations contain a number of adjustment provisions, only one of which, 42 U.S.C. § 1395ww(d)(5)(F) (1993), is at issue in this case. Section 1395ww(d)(5)(F), so far as relevant here, requires an additional payment per patient discharge for hospitals serving a significantly disproportionate number of low-income patients.[5] A hospital is deemed to serve a significantly disproportionate number

---

**3.** As TEFRA's yearly percentage increases in reimbursement are set by statute, 42 U.S.C. § 1395ww(b)(1)(B)(i) (1988), the Secretary may not adjust them to bring reimbursement more in line with actual costs.

**4.** The PPS seeks to promote efficiency by permitting hospitals to keep the difference between actual costs and the DRG amount, and by denying hospitals payment for costs over the DRG amount. *See* H.R.Rep. No. 25, 98th Cong., 1st

Sess. 132 (1983), *reprinted in* 1983 U.S.C.C.A.N. 219, 351; S.Rep. No. 23, 98th Cong., 1st Sess. 47 (1983), *reprinted in* 1983 U.S.C.C.A.N. 143, 187.

**5.** Under this scheme, a low income patient is one who either receives both Medicare Part A and supplemental security income benefits, or receives both Medicaid and Medicare. 42 U.S.C. § 1395ww(d)(5)(F)(iv)–(viii) (1988); 42 CFR § 412.106(b)(2) (1993).

of low-income patients if the proportion of its total patient days consisting of patient days attributable to low-income patients exceeds specified percentage criteria, e.g., fifteen percent if the hospital is located in an urban area and has one hundred or more beds. *Id.* § 1395ww(d)(5)(F)(v)-(vi). As we have noted, this Disproportionate Share Adjustment provision reflects Congress' determination that DRG payments, which are based on national and regional average costs for particular illnesses, do not adequately reflect the added costs of treating low-income patients, who tend to be sicker and more costly to treat than the average.

### Administrative Proceedings

Rye is a private psychiatric hospital reimbursed under TEFRA. 42 U.S.C. § 1395ww(d)(1)(B) (1988). In 1992, it requested the Board to determine · that the Board lacked authority to decide, among other things, whether 42 C.F.R. § 412.106 incorrectly interpreted 42 U.S.C. § 1395ww by excluding certain PPS-exempt hospitals from receiving the Section 1395ww(d)(5)(F) DSA or, alternatively, whether the statute deprived those hospitals of due process of law. Such a determination was a precondition to Rye's right to seek judicial review. 42 U.S.C. § 1395oo(f)(1) (1988); 42 U.S.C. § 405(h) *as incorporated by* 42 U.S.C. § 1395ii (1988). On May 8, 1992, the Board made the requested determination and granted Rye's request for expedited judicial review. This case followed shortly thereafter.

### Discussion

### The DSA Does Not Apply to PPS–Exempt Hospitals

Although the question is posed by the cross-appeal as a result of the sequence in which the notices of appeal were filed, we view the question whether the DSA established by Section 1395ww(d)(5)(F) applies to Rye and other PPS-exempt hospitals as the logical starting point for analysis.

Clause (i) of Section 1395ww(d)(5)(F) provides:

For discharges occurring on or after May 1, 1986, the Secretary shall provide, in accordance with this subparagraph, for an additional payment amount *for each subsection (d) hospital* which—(I) serves a significantly disproportionate number of low-income patients (as defined in clause (v)), or

meets certain other criteria. (Emphasis added). Clauses (ii) through (viii) proceed to set forth the formula for determining the additional payment (clause ii), define a term used in making that determination (clauses iii and iv), define a hospital that "serves a significantly disproportionate number of low-income patients" (clause v), define a term used in clause v (clause vi), and set forth two formulae relevant to two subsets of the hospitals to which subparagraph (F) applies (clauses vii and viii). Thus, the question whether the DSA is available under Section 1395ww(d)(5)(F) to a particular hospital turns on whether it is a "subsection (d) hospital."

Section 1395ww(d)(1)(B) states in relevant part:

As used in this section, the term 'subsection (d) hospital' means a hospital located in one of the fifty States or the District of Columbia other than—

(i) a psychiatric hospital (as defined in section 1395x(f) of this title).

Since it is undisputed that Rye is a psychiatric hospital as defined in Section 1395x(f), Rye is not a "subsection (d) hospital" and therefore is not entitled to the DSA under Section 1395ww(d)(5)(F). Moreover, as the District Court held, 846 F.Supp. at 1180, and as Rye concedes (Rye Br. 38), the Secretary's regulations specifically exclude PPS-exempt hospitals. 42 C.F.R. § 412.106 (1993); *accord,* 53 Fed.Reg. 38476, 38480 (Sept. 30, 1988). As the official charged with administering this complex program, her interpretation is controlling unless it is unreasonable. *See, e.g., Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843–45, 104 S.Ct. 2778, 2782–83, 81 L.Ed.2d 694 (1984); *see also CHA,* 46 F.3d at 219. On the basis of the statutory language described above and the role of the DSA in the statutory scheme, discussed below, there is no basis for rejecting her interpretation.

Rye disputes this conclusion on two bases. Each is without merit.

Rye first argues that the reference in Section 1395ww(d)(5)(F)(i) to "subsection (d) hospital[s]" does not prevent payment of the DSA to Rye despite the fact that Rye concededly is not a subsection (d) hospital. Section 1395ww(d)(5)(F)(iv) defines the term "disproportionate share adjustment percentage" for hospitals that are "not described in clause (i)(II)" and that meet certain additional criteria. Rye's argument seems to be that Rye is not a hospital described in Section 1395ww(d)(5)(F)(i)(II) and, in consequence, that it gets the benefit of Section 1395ww(d)(5)(F)(iv). There are at least two problems with the argument.

To begin with, the argument ignores the structure of Section 1395ww(d)(5)(F). Clause (i) states that the additional DSA payments are to be made only to "subsection (d) hospitals." It then identifies in subclauses (i)(I) and (i)(II) two groups of subsection (d) hospitals. Thus, subclauses (i)(I) and (i)(II) both are subsets of clause (i). The disproportionate share adjustment percentages for these two groups of subsection (d) hospitals are set out in clauses (iii) and (iv) respectively. Thus, there is no basis in the text for Rye's contention that hospitals which are not subsection (d) hospitals are entitled to the DSA under Section 1395ww(d)(5)(F). Put another way, all of Section 1395ww(d)(5)(F) is limited to subsection (d) hospitals.

The argument also neglects the substance of Section 1395ww(d)(5)(F)(iv). That clause does no more than define the term "disproportionate share adjustment percentage" for subsection (d) hospitals described in clause (i)(II). The term is used in computing the additional amounts payable pursuant to clause (i), which are payable only to subsection (d) hospitals. In consequence, even if Rye somehow fell within clause (iv), it would not be entitled to any additional payment because it does not fall within clause (i).

Rye seems to argue also that 42 U.S.C. § 1395ww(a) (1988) requires payment of the DSA to TEFRA as well as PPS hospitals. The basis of the argument is the following language in subparagraph (2):

The Secretary shall provide for such exemptions from, and exceptions and adjustments to, the limitation established under paragraph (1)(A) as he deems appropriate, including those which he deems necessary to take into account—

\*     \*     \*     \*     \*     \*

(B) the special needs of psychiatric hospitals and of public or other hospitals that serve a significantly disproportionate number of patients who have low-income or are entitled to benefits under part A of this subchapter.

The difficulty with the argument, however, is that it tears this language from context.

Sections 1395ww(a)–(c) were enacted in 1982 by Section 101(a)(1) of the Tax Equity and Fiscal Responsibility Act, which also established the TEFRA reimbursement system and directed the Secretary to develop a prospective payment system and led to the enactment of PPS. Pub.L. 97–248, § 101(a)(1), 96 Stat. 331–35 (1982). They were part of an expansion of then-existing reimbursement restrictions known as Section 223 limits. H.R.Conf.Rep. No. 760, 97th Cong., 2d Sess. 417–18 (1982), *reprinted in* 1982 U.S.C.C.A.N. 1190, 1198.

Subparagraph (A) of Section 1395ww(a)(1) provides in substance that the Secretary is prohibited from recognizing as reasonable costs which exceed the average for similar groupings of hospitals by stipulated percentages. Subparagraph (B) directs the Secretary to establish case mix indices for short-term hospitals and to set limits for each hospital based upon the general mix of types of medical cases for which it provides services. Subparagraph (C) provides in substance that the costs recognized as reasonable prior to the enactment of this statute set a floor under the costs that were to be recognized as reasonable. Subparagraph (D) provides that subparagraph (A) would not apply to reporting periods beginning after October 1, 1983. Thus, the cost limits established in Section 1395ww(a)(1)(A) have not applied to new reporting periods for many years.

Section 1395ww(a)(2), upon which Rye relies, and (a)(3) both explicitly provide for exceptions to the limitations established by Section 1395ww(a)(1)(A). In other words, Section 1395ww(a)(2)(B) directs the Secretary to take into account, to the extent she deemed necessary, "the special needs of psychiatric hospitals ... that serve a significantly disproportionate number of" low-income patients *in making exceptions to the 1395ww(a)(1)(A) cost limits.* As the Section 1395ww(a)(1)(A) cost limits do not apply to periods beginning on or after October 1, 1983, Sections 1395ww(a)(2) and, for that matter, (a)(3) have no bearing with respect to such periods and thus no bearing on Rye's right to reimbursement in any period relevant here.[6]

Accordingly, the District Court correctly held that Rye is not entitled to a Disproportionate Share Adjustment pursuant to 42 U.S.C. § 1395ww(d)(5)(F).

### *The "Case Mix" Adjustment Does Not Include the DSA*

■ This brings us to the Secretary's contention that the District Court erred in holding that Section 1395ww(b)(4)(A) in substance incorporates the DSA on the ground that the term " 'case mix' includes the concept of a 'significant disproportionate number of low-income patients' as defined in 42 U.S.C. § 1395ww(d)(5)(F)." 846 F.Supp. at 1182.

As noted above, Section 1395ww(b)(4)(A) provides in relevant part that the Secretary shall adjust reimbursements "where events beyond the hospital's control or extraordinary circumstances, including changes in the case mix of such hospital, create a distortion in the increase in costs for a cost reporting period...." 42 U.S.C. § 1395ww(b)(4)(A) (1988).

The District Court reasoned that this provision "modifies all other statutory provisions and regulations under them" and, in consequence, that "none of the regulations can be

read to impose unreasonable restrictions on reimbursement for medically necessary services provided to qualified Medicare beneficiaries...." 846 F.Supp. at 1182. It evidently accepted Rye's view that the lack of a DSA for TEFRA hospitals unreasonably would deprive such hospitals of reimbursement for the presumptively higher costs of treating low-income patients, for it concluded that Section 1395ww(b)(4)(A) "deals in different language with the same factual problem of a substantial proportion of low-income patients." *Id.* at 1183. Based on that premise, it held that the term "case mix" in that section "includes the concept of 'significant disproportionate number of low-income patients.' " *Id.* Accordingly, the judgment declared that the Secretary must consider the treatment of a disproportionate number of low-income patients in determining whether Rye is entitled to an adjustment based on a change in its case mix. We conclude that this was error.

We begin with the fact that the statute manifestly distinguishes between adjustments based in "case mix" changes and those based on the existence of a disproportionate share of low-income patients. *Compare* 42 U.S.C. § 1395ww(b)(4)(A) *with id.* § 1395ww(d)(5)(F). A reading of Section 1395ww in its entirety demonstrates that the term "case mix" used in Section 1395ww(b)(4)(A) refers to the medical condition of a hospital's patients, not to their financial circumstances.

As we have noted, Section 1395ww(a)(1)(A) established reimbursement ceilings as part of the expansion of the Section 223 limits. Section 1395ww(a)(1)(B)(i) provides:

> For purposes of subparagraph (A) the Secretary shall establish *case mix indexes* for all short-term hospitals, and shall set limits for each hospital *based upon the general mix of types of medical cases* with respect to which such hospital provides services for which payment may be made under this subchapter. (Emphasis added).

---

**6.** In any case, Section 1395(a)(2) required the Secretary to make only such provision as the Secretary "deems necessary." The Secretary's judgment that no such provision is necessary is entitled to substantial deference. *See, e.g., Chev-*

*ron, U.S.A., Inc.,* 467 U.S. at 843–45, 104 S.Ct. at 2782–83. As we explain below, the Secretary's conclusion that no reimbursement adjustment based solely on the proportion of low income patients is warranted is not unreasonable.

Thus, the language of Section 1395ww(a)(1)(B)(i) makes it reasonably plain that "case mix" refers to the mix of medical rather than financial conditions of the patients.[7]

█ Our view is confirmed by Section 1395ww(a)(2), which we have discussed already in rejecting Rye's argument that Section 1395ww(a) requires payment of the DSA to TEFRA as well as PPS hospitals. *Ante*, at 1170. Concerned that the reimbursement limits enacted in 1982 in Section 1395ww(a)(1)(A) might have an adverse impact on hospitals serving a disproportionate share of low-income patients, Congress provided in Section 1395ww(a)(2)(B) that the Secretary should make such exemptions and adjustments as the Secretary deemed necessary to accommodate "the special needs of ... hospitals that serve a significantly disproportionate number of patients who have low-income...." If the term "case mix" included the concept of the mix of financial conditions of a hospital's patients, there would have been no need for the quoted language in Section 1395ww(a)(2)(B). As a statute must be construed to give meaning to each of its parts,[8] the enactment of this language demonstrates that the District Court erred in concluding that the term "case mix" "includes the concept of 'significant disproportionate number of low-income patients.'"

The legislative history also supports this conclusion. For one thing, the committee reports demonstrate that Congress referred to "case mix" in the context of indices of case mix complexity which, like the Yale University system which it specifically mentioned, dealt with medical condition. *See, e.g.,* S.Rep. No. 97–494, 97th Cong., 2d Sess. 24–25 (1982), *reprinted in* 1982 U.S.C.C.A.N. 781, 800–01; H.R.Conf.Rep. No. 760, 97th Cong., 2d Sess. 418 (1982), *reprinted in* 1982 U.S.C.C.A.N. 1190, 1198; *See also* 17 Fed. Reg. 43296, 43303 (Sept. 30, 1982). For another, at least two subsequent amendments to the statute demonstrate that Congress does not regard "case mix" as embracing the mix of financial conditions of patients.[9]

Were there any doubt concerning this conclusion, and we think there is not, it would be resolved by the Secretary's construction of the statute. The Secretary repeatedly has construed the term "case mix" to refer to the types of medical cases treated by hospitals. *See, e.g.,* 47 Fed.Reg. 43296, 43303 (Sept. 30, 1982) ("case mix" relates to "number of possible combinations of diagnoses, procedures, complications and admitting status"); 47 Fed.Reg. 43282, 43285 (Sept. 30, 1982) (case mix refers to "pattern of case complexity"). As we have noted already, the Secretary's interpretation of this labyrinthine statute is controlling unless it is plainly inconsistent with the statutory language or manifestly unreasonable. The Secretary's position is in accord with the statutory language for the reasons stated above. Moreover, this result is entirely consistent with the very different conceptual underpinnings of the TEFRA and PPS reimbursement systems.

The existence of the DSA is attributable to Congress's conclusion that low-income patients tend to be in poorer health, and therefore to cost more to treat, than others. A hospital that treated an unusually high num-

---

7. *See also Massachusetts Federation of Nursing Homes, Inc. v. Massachusetts,* 772 F.Supp. 31, 33 (D.Mass.1991); *New Jersey Ass'n of Health Care Facilities, Inc. v. Gibbs,* 838 F.Supp. 881, 912 (D.N.J.1993); *Multicare Medical Center v. Washington,* 768 F.Supp. 1349, 1361–62 & n. 3 (W.D.Wash.1991).

8. *United States v. Nordic Village Inc.,* 503 U.S. 30, 34, 112 S.Ct. 1011, 1015, 117 L.Ed.2d 181 (1992); *United States v. Bernier,* 954 F.2d 818, 819 (2d Cir.1992).

9. First, when Congress enacted the DSA provision for PPS hospitals in 1986, it instructed the Secretary to "adjust[ ]" "for variations in case mix among hospitals" (42 U.S.C. § 1395ww(d)(2)(C)(iii)) and exclude DSA payments made under Section 1395ww(d)(5)(F) (*id.* § 1395ww(d)(2)(C)(iv)) when computing updated PPS reimbursement rates. If "case mix" included the concept of the financial condition of a hospital's patients, Section 1395ww(d)(2)(C)(iv) would be rendered meaningless.

Second, in 1990, Congress amended the Medicare statute to instruct the Secretary to place PPS-exempt hospitals on a PPS system and to consider "case mix" and the treatment of low income patients as separate issues. Pub.L. 101–508, § 4005(b) 104 Stat. 1388–40 (1990). This is not consistent with the contention that "case mix" subsumes the concept of the financial condition of the patients.

ber of low-income patients therefore would be treating an unusually high number of patients who tend to be sicker, and to cost more to treat, than others.

The PPS system reimburses hospitals on a DRG basis—that is, it pays per illness, with the payment determined on the basis of national or regional averages for treatment of that illness. PPS hospitals that treat a disproportionate share of low-income patients therefore would be shortchanged—indeed, one might say penalized—for doing so unless the per illness reimbursement were adjusted upward to take account of that fact.

The situation is quite different for a TEFRA hospital. Its reimbursements are based on its allowable costs in its base year. Those allowable costs include any added costs associated with the treatment of low-income patients in the base year. Hence, as long as its proportion of low-income patients does not increase above what it was in the base year, the hospital is not sustaining any extra costs that are not already accounted for in the base as a result of its treatment of low-income patients in the base year. There is, in consequence, no reason that a TEFRA hospital should need or receive reimbursement adjustments simply by virtue of the fact that it treats a disproportionate share of low-income patients. Indeed, if the allowable costs in the base year reflect additional costs of treating low-income patients, the addition of a DSA to a TEFRA hospital's could result in the hospital being reimbursed more than once for the same incremental costs.

We recognize, of course, that a TEFRA hospital may incur added costs that are not included in its base and that are associated with its treatment of low-income patients, particularly if the proportion of low-income patients served increases as compared with its base year. But a TEFRA hospital is not without recourse in these circumstances. It may apply for an adjustment under Section 1395ww(b)(4)(A) and 42 C.F.R. §§ 413.40(g), 413.40(i) (1993). The adjustment, however, would be based on the fact that more of its patients are sicker or require more intensive or extensive care, not on their income levels. *See, e.g.,* 42 C.F.R. §§ 413.40(g)(3)(ii)(D) (1993) (referring to adjustment based on in-

creases in service intensity or length of stay), 413.40(i)(1)(i)(B)(3) (referring to differences in severity of illnesses among patients served).

In view of these considerations, we cannot say that the Secretary's construction of the statute is unreasonable.

### *Rye's Constitutional Claims*

■ Rye contends that a construction of the statute that would not extend the DSA to it would deprive it of equal protection of the laws. The contention is entirely without merit.

■ Legislation in the economic and social welfare area, which includes Medicare, is tested under a deferential standard of review. If the statutory "classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.'" *Dandridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970), *quoting Lindsley v. Natural Carbonic Gas Co.,* 220 U.S. 61, 78, 31 S.Ct. 337, 340, 55 L.Ed. 369 (1911).

Insofar as Rye contends that the statute is unconstitutional on its face, its challenge must fail. Given the different conceptual underpinnings of the PPS and the TEFRA reimbursement systems, it was entirely reasonable for Congress to provide a DSA in the former but not in the latter.

■ It of course is possible that a TEFRA hospital might incur added costs associated with the treatment of low-income patients and that it would not receive adequate payment under the TEFRA reimbursement system. It is perhaps even theoretically possible that the application of the statute and regulations in a specific case might yield such an aberrant result as to raise a question of unconstitutionality in application. But no such claim is available here. Rye, as far as the record discloses, has not sought such an adjustment under 42 C.F.R. § 413.40(g) or (i), much less obtained an adverse final decision. Accordingly, any claim that the statute and regulations are unconstitutional as applied to Rye with respect to any given reim-

bursement period is not ripe. *Reiter v. Cooper*, —— U.S. ——, ——, 113 S.Ct. 1213, 1220,. 122 L.Ed.2d 604 (1993); *Williamson Co. Regional Planning v. Hamilton Bank*, 473 U.S. 172, 192–93, 105 S.Ct. 3108, 3119–20, 87 L.Ed.2d 126 (1985); *FTC v. Standard Oil Co.*, 449 U.S. 232, 101 S.Ct. 488, 66 L.Ed.2d 416 (1980); *CHA*, 46 F.3d at 219–20.

### Conclusion

Rye claims in essence that it is treated unfairly because no provision is made in TEFRA to reimburse it for the added cost of treating low-income patients, whereas PPS hospitals receive the DSA. As we have shown, however, both the TEFRA and PPS systems make allowance for the added costs of treating patients who require unusual levels of service, albeit in different ways. Congress acted well within appropriate bounds in doing so. Accordingly, for the reasons set forth above, the judgment of the District Court is affirmed insofar as it determines that Rye is not entitled to receive a Disproportionate Share Adjustment pursuant to 42 U.S.C. § 1395ww(d)(5)(F) and otherwise reversed. The case is remanded for the entry of a declaratory judgment consistent with this opinion.